## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA
## (TALLAHASSEE DIVISION)

| | | |
|---|---|---|
| January Littlejohn, | ) | |
| Jeffrey Littlejohn, | ) | |
| Plaintiffs | ) | Case No. 4:21-CV-00415 |
| v. | ) | |
| School Board of Leon County, | ) | |
| Florida, Rocky Hanna, individually, | ) | |
| and in his official capacity as | ) | Jury Trial Demanded |
| Superintendent of Leon County | ) | |
| Schools, Dr. Kathleen Rodgers, | ) | |
| individually, and in her official | ) | |
| capacity as Assistant Superintendent, | ) | |
| Equity Officer and Title IX | ) | |
| Compliance Coordinator for Leon | ) | |
| County Schools, | ) | |
| Defendants. | ) | |

## VERIFIED COMPLAINT FOR PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF, DECLARATORY JUDGMENT AND DAMAGES

Plaintiffs, January Littlejohn and Jeffrey Littlejohn ("Plaintiffs") by and through counsel, file this civil action and respectfully request this Court to issue injunctive relief, a declaratory judgment and award damages for violations of the United States Constitution, Florida Constitution, and Florida Statutes by Defendants, School Board of Leon County, Rocky Hanna, and Dr. Kathleen Rodgers.

In support thereof, Plaintiffs state:

1

**INTRODUCTION**

1.      Plaintiffs bring this action to vindicate their fundamental rights to direct the upbringing of their children as established by the United States and Florida constitutions and by Florida Statutes, Chapter 1014 and. § 743.07. Defendants have violated Plaintiffs' fundamental rights by, *inter alia*, implementing a protocol which explicitly circumvents parental notification and involvement in critical decisions affecting their children's mental, emotional and physical health, *i.e.,* the children's assertion of a discordant gender identity and accommodations to facilitate asserting the discordant gender identity at school.

2.      Defendants further violated Plaintiffs' fundamental rights by implementing a protocol and training district staff to conceal from parents information regarding their children's assertion of a discordant gender identity, including, *inter alia*, assumption of a new name, use of different pronouns, use of opposite sex privacy facilities and use of opposite sex lodging on off campus trips.

3.      Defendants further violated Plaintiffs' fundamental rights by directing staff to deceive parents by using the children's birth name and corresponding pronouns in the presence of or communication with the parents while using the children's new chosen name and pronouns at all other times.

2

## JURISDICTION AND VENUE

4.     This action is filed pursuant to 42 U.S.C. § 1983 seeking redress of injuries suffered by Plaintiffs from deprivation, under color of state law, of rights secured by the Fourteenth Amendment to the United States Constitution, by the laws of the United States and the laws of Florida. Jurisdiction is proper in this Court pursuant to 28 U.S.C. §§ 1331 and 1343(a).

5.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) and other applicable law because the events and omissions giving rise to the claims in this action arose in Leon County, Florida, which is situated within the district and divisional boundaries of the Northern District of Florida.  Venue is also proper in this Court because the Defendants reside or have their principal place of business in this District.

6.     This Court is authorized to grant declaratory judgment under the Declaratory Judgment Act, 28 U.S.C. §§ 2201-02, implemented through Federal Rule of Civil Procedure 57, and to issue injunctive relief under Federal Rule of Civil Procedure 65.

7.     An actual controversy exists between the parties involving substantial constitutional issues, in that Plaintiffs allege that Defendants' policies, procedures, directives and actions taken in accordance with them, on their face and as applied, violate the United States Constitution and have infringed Plaintiffs' rights, while

Defendants allege that their policies, procedures, directives, and actions comport with the Constitution.

8.     This Court is authorized to grant Plaintiffs' prayer for relief regarding costs, including a reasonable attorney's fee, under 42 U.S.C. § 1988.

## PARTIES

9.     Plaintiffs January and Jeffrey Littlejohn are residents of Leon County, Florida and parents of children attending Leon County Schools.

10.     Defendant School Board of Leon County is the governing body for public schools in Leon County, Florida, with the authority to sue and be sued, and was at all times material acting within the course and scope of its authority pursuant to Article IX, § 4 of the Florida Constitution, Fla. Stat. §§ 1001.41-1001.42 and further under color of law.

11.     Defendant Rocky Hanna is the Superintendent of Leon County Schools ("LCS"), having been elected by the citizens of Leon County pursuant to Article IX, § 5 of the Florida Constitution. He is and was at all times relevant herein, acting within the course and scope of his constitutional authority as Superintendent and his duties under Fla. Stat. §§ 1001.49, 1001.51, and other applicable Florida law and consistent with the customs, policies, and practices of Leon County Schools. He is sued in his individual and official capacities.

12.     Defendant Dr. Kathleen Rodgers is the Assistant Superintendent, Equity Officer and Title IX Compliance Coordinator for LCS. She is and was at all times relevant herein, acting within the course and scope of her employment, under color of state law and consistent with the customs, policies, and practices of LCS. She is sued in her individual and official capacities.

## STATEMENT OF FACTS

### Defendants' Transgender Student Support Directives

13.     Plaintiffs are informed and believe and based thereon allege that the District's LGBTQ+ Equity Committee created the "LCS Lesbian, Gay, Bisexual, Transgender, Gender Nonconforming and Questioning Support Guide" (the "Guide"). A true and correct copy of the Guide is attached hereto, marked as Exhibit A and incorporated herein by reference.

14.     Plaintiffs are informed and believe and based thereon allege that the Guide was prepared under the supervision of Defendant Rodgers as part of the course and scope of her employment as Assistant Superintendent and Equity Officer for Leon County Schools. Dr. Rodgers is listed as a contact person on page 28 of the Guide.

15.     Plaintiffs are informed and believe and based thereon allege that Defendant Hanna was aware of and approved of the committee's preparation of the Guide and its contents as part of the exercise of his duties as Superintendent of Leon

5

County Schools under, *inter alia,* Fla. Stat. §§ 1001.49, 1001.51 and 1012.27. Mr. Hanna is listed as a contact person on page 28 of the Guide.

16.     Plaintiffs are informed and believe and based thereon allege that the School Board was aware of, authorized and approved of the development of the Guide and its contents. Plaintiffs are informed and believe and based thereon allege that Board Chairwoman Georgia "Joy" Bowen listed development of the Guide as a "success story" for LCS's efforts to promote equity and access for LGBTQ+ students during a presentation at "All Together Now 2021: School Board Policies: Procedures that Promote Equity and Access for LGBTQ+ Students" hosted by Equality Florida February 25-26, 2021.[1]

17.     Ms. Bowen is listed as the vice-chair of the Equity Committee for the Florida School Board Association. The Equity Committee meets monthly with Equality Florida.

18.     Plaintiffs were not aware of the Guide or the protocols and directives contained within the Guide until November 6, 2020 after LCS staff had used the protocols with Plaintiffs' child without Plaintiffs' knowledge or consent, in violation of their parental rights, as described *infra,* and Plaintiffs had repeatedly requested that LCS staff provide legal justification for the actions taken.

---

[1]     https://m.youtube.com/watch?v=m1-djGJpXI&list= PLUWXEguBhw7y BHiPXADDAc6tGtsvkNlDe&index=17 at 29:19.

6

19.    Plaintiffs were not notified about, and are informed and believe and based thereon allege that other parents were not notified about, directed to, or provided with copies of the Guide as part of communications and notifications from LCS staff to parents. Nevertheless, the Guide purports to "be a tool for schools, students and their parents and legal guardians to effectively navigate existing laws, regulations and policies that support LGBTQ+ LCS students." (Exhibit A, p. 3).

20.    The Guide "effectively navigates," that is, it directs, LCS administrators and staff away from communicating with and involving parents in critical decisions regarding their children's physical, emotional, and mental health in contravention of rights established under the United States and Florida constitutions and Florida statutes.

21.    For example, the Guide states:

> Under the Family Educational Rights and Privacy Act (FERPA), students, current or former, have a right to seek to amend their school records if said records are "inaccurate, misleading, or in violation of the student's rights of privacy." (34 C.F.R. § 99.7(a)(2)(ii)). Transgender students wishing to change their name and gender marker on their educational records can seek such an amendment of certain records under this federal law. (Exhibit A, p. 14).

In fact, FERPA provides that it is **parents**, not students, who have the right to review and request amendments to misleading or inaccurate school records until the student reaches age 18 or is legally emancipated. 20 U.S.C. § 1232g(7)(d); 34 C.F.R. § 99.7(a)(2)(ii). The Guide therefore falsely directs and instructs administrators and

staff that under FERPA they can change a student's records at the student's request without notifying parents.

22.     The Guide's false assertion that administrators and staff can change a student's name at the student's request under FERPA represents a *de facto* policy sanctioned by the School Board, as reflected and affirmed in Chairwoman Bowen's listing of the directive as one of the "success stories" for LCS's efforts to increase equity and access for LGBTQ+ students at the All Together Now conference and Chairwoman Bowen's statements: "We have allowed students to have diplomas with their affirmed names at their request." "We have put measures in place to allow students to use their 'affirmed' name at school. Students' affirmed name is placed in the system at their request so that substitute teachers are aware that they go by a name different from their legal name."[2]

23.     The Guide further directs and instructs administrators and staff to deliberately and intentionally conceal from parents information related to their children's assertion of a discordant gender identity:

> Q: A student has exhibited behavior in school leading administrators or teachers to believe the student is LGBTQ+. Should the parents or legal guardians be notified?
> A: No. Outing a student, especially to parents, can be very dangerous to the students [sic] health and well-being. Some students are not able to be out at home because their parents are unaccepting of LGBTQ+ people out. As many as 40% of homeless youth are LGBTQ+, many of whom have been rejected by their families for being LGBTQ+. Outing

---

[2]     *Id.* at 32:40

students to their parents can literally make them homeless. (Exhibit A, p. 15).

24.     Plaintiffs are informed and believe and based thereon allege that the directive to not tell parents about their children's gender identity issues represents a *de facto* policy sanctioned and authorized by the School Board, in accordance with Chairwoman Bowen's statement at the "All Together Now" conference:[3]

> There are some segments of the community that would be more receiving and accepting of LGBTQ students than others. And in those pockets in which parents don't have that understanding, and parents won't accept, I think one of the challenges that we have to deal with is to find a way to help the parents see who these students are and there is a great need. I know there are a lot of pockets here in Leon County, a lot of African-American parents who say, "There's nothing wrong with you. You just need to leave it alone." They just dismiss it. I don't mean to point fingers but we need to deal with the elephant in the room and have the kind of training and understanding to have these parents see that these children are important.

25.     The Guide further directs and instructs administrators and staff to deliberately disregard the rights of parents in a document labeled "Leon County School District Transgender/Gender Nonconforming Student Support Plan." ("Student Support Plan") (Exhibit A, pp. 19-27).

26.     Part A of the Student Support Plan includes an intake checklist that asks whether the student's parents are aware of the student's asserted discordant gender identity, whether the parents are "supportive," and whether they should be notified. The Guide authorizes the minor student to decide whether his or her parents will be

---

[3]     *Id.* at 23:00.

9

notified of something as significant as the child's belief that he is not a boy or she is not a girl or distress concerning his or her biological sex. (Exhibit A, p. 19).

27.    Part B of the Student Support Plan, which is completed during a meeting with the student, LCS staff, and —only if the student consents— the parents, includes the question:

> Are guardians(s) of this student aware and supportive of their child's gender transition? __Y __N. If not, what considerations must be accounted for in implementing this plan? (Exhibit A, p. 20).

It is the child who determines whether his or her parents are "supportive" of his or her "gender transition," and, therefore "entitled" to be notified and involved in addressing the issues surrounding the child's belief.

28.     Part B of the Student Support Plan includes questions regarding which name and pronoun the child will use, which communal sex-separated restroom, locker room or shower they will use and with which sex-separated group the child will room on overnight trips. If the child has indicated that his or her parents are not "supportive" and therefore not present at the meeting, then the Student Support Plan authorizes minor children to make these mature, consequential decisions with no notification to or input from parents.

29.    Plaintiffs are informed and believe and based thereon allege that LCS administrators and staff were provided with the Guide and trained and instructed by Dr. Rodgers and her staff to follow the directions in the Guide whenever a child

announced that he or she believed that he was not a boy or she was not a girl, or expressed distress with his or her biological sex (expressed a discordant "gender identity.").

30.    Plaintiffs are further informed and believe and based thereon allege that Dr. Rodgers and her staff instructed LCS staff that students who express a discordant gender identity are protected by law from having their parents notified without the child's consent. Plaintiffs are further informed and believe and based thereon allege that Dr. Rodgers and her staff instructed LCS staff that under the law parents were not permitted to attend gender support plan meetings unless the child agreed.

31.    Plaintiffs are informed and believe and based thereon allege that Dr. Rodgers and her staff instructed LCS staff that parents could not by law be told anything about their child's expression of a discordant gender identity unless the child consented.

32.    The Guide directs LCS staff that children are to be permitted to use any sex-separated privacy facility that the child says corresponds to the "gender identity" the child asserts regardless of concerns raised by other children.

Q: A student has complained about a person of the wrong sex in the bathroom or locker room area. What action should be taken?
A: As part of LCS policy against discrimination based on gender identity, any student may use restroom and locker room facilities in accordance with their gender identity. Students cannot be singled out, such as requiring them to use a separate bathroom from their peers (i.e., using the nurse's bathroom or single occupancy bathroom only). Students may request additional privacy in locker rooms and should be

provided with a private area where they can change clothes for gym class or athletic activities. Again, LGBTQ+ students cannot be singled out. The privacy areas should be offered to all students who wish to change with a higher level of privacy for any reason. Toilet stalls are not changing areas. (Exhibit A, p. 14).

33.     The Guide claims that children's choice of privacy facility is part of LCS's non-discrimination policy. LCS's Nondiscrimination and Equal Educational Opportunity Policy, 2260, provides in pertinent part:

> Any form of discrimination or harassment can be devastating to an individual's academic progress, social relationship, and/or personal sense of self-worth. As such the School Board will not discriminate nor tolerate harassment in its educational programs or activities on the basis of race, color, national origin, sex, disability (including HIV, AIDS, or sickle cell trait), marital status, age (except as authorized by law), religion, military status, ancestry, or genetic information, which are classes protected by State and/or Federal law (Protected Classes). In addition, the Board will not discriminate nor tolerate harassment in its educational programs or activities on the basis of sexual orientation or gender identity.

Neither Policy 2260 nor any other published School Board policy, nor published School Board Administrative Procedure, contains language alerting parents and students that children will be permitted to unilaterally choose which sex-separated privacy facility they will use based on their asserted gender identity.

34.     Nevertheless, Defendant Rodgers and other administrators directed LCS staff to permit children who assert a discordant gender identity to unilaterally choose which sex-separated privacy facility they will use without parental input and to disregard other students' privacy and safety concerns.

35.    Plaintiffs are informed and believe and based thereon allege that the directive granting children the choice of privacy facility represents a *de facto* policy sanctioned by the School Board as reflected by Chairwoman Bowen listing facility choice as a "success story" for LCS's efforts to increase access and equity for LGBTQ+ students at the "All Together Now" conference: "We have worked with students on a case-by-case basis for bathroom usage when they bring to our attention issues on identity."[4]

36.    Plaintiffs were not notified and are informed and believe that other parents and students were not and are not notified that children could encounter and would be required to accept opposite sex students in their privacy facilities without regard for their privacy and safety concerns.

37.    The Guide also states that the LCS nondiscrimination policy requires that LCS staff and students comply with a child's assertion that he or she must be called by a new name and/or pronouns or face a harassment charge:

> Q: A student has complained that a teacher, student, or school employee has intentionally "misgendered" them. What does this mean and what should be done about it?
> A: Misgendering a student is intentionally using the wrong gender pronouns. As part of LCS policy against discrimination based on gender identity, misgendering is considered harassment. Students, faculty and staff are expected to treat their peers with respect, including using their preferred gender pronouns, even if those pronouns are gender neutral, (i.e., "they", "them"). Similarly, consistent, intentional "deadnaming", or using the discarded birth name of a student, faculty,

---

[4]    *Id.* at 32:40.

or staff member that is not the preferred name of that person is considered harassment. (Exhibit A, p. 14).

Neither Policy 2260 nor any other published School Board policy, nor published School Board Administrative Procedure contains language alerting parents and students that children will be permitted to unilaterally choose a new name and/or pronouns and demand that other children, teachers, and staff use the new name/pronouns under penalty of a harassment charge and attendant discipline.

38.    Nevertheless, Defendant Rodgers and other administrators directed LCS staff to permit children who assert a discordant gender identity to assert a new name and new pronouns and require that fellow students, teachers, staff, and other adults use the new identifiers or face harassment charges and attendant discipline.

39.    Plaintiffs were not notified and are informed and believe that other parents and students were not and are not notified that children could be required to use a new name or pronoun for a classmate, *i.e.,* utter something that is false, or be subject to a harassment charge and attendant discipline, with no consideration given for the children's First Amendment rights.

40.    Plaintiffs are informed and believe and based thereon allege that the directive granting children the choice of name and pronouns represents a *de facto* policy sanctioned by the School Board as reflected by Chairwoman Bowen's statement at the "All Together Now" conference that name and pronoun choice was a challenge facing LGBTQ+ students that LCS had addressed: "Affirmed names and

14

pronouns are a central part of a student's identity. We want to get those right, so we include our pronouns in Zoom, or in class we say, 'Hi I am Mr. Stewart and I use the pronouns he/him.'"[5]

41.     Chairwoman Bowen also listed "rising family tensions," "stress of living in a non-affirming household," and "parent/community pushback on LGBTQ+ inclusion" as challenges LGBTQ+ students face that the LCS Board had to address.[6]

42.     Chairwoman Bowen stated that "unmet medical needs" including puberty blockers (medications that arrest pubertal development in children) were a challenge for LGBTQ+ students that "hopefully we can" have remedies in place for.[7] Chairwoman Bowen did not mention parental involvement in providing such medical "remedies" to minor students.

**Defendants Secretly Create Transgender Support Plan for Plaintiffs' Child**

43.     Plaintiffs' child, A.G., was a student at Deerlake Middle School during the 2019-2020 school year. A.G. had been diagnosed with ADHD and had in place an accommodation plan under Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. §§ 701 *et.seq.*

---

[5]      *Id.* at 15:11.

[6]      *Id.*

[7]      *Id.*

44.     During spring 2020 A.G. was having difficulty adjusting to the remote learning that was in place because of the COVID-19 pandemic. Online learning was not conducive to A.G.'s ADHD and she began to get agitated and depressed sitting at the computer all day.

45.     By late spring 2020, A.G. told her parents that she was confused about her gender and believed she might be non-binary. Mrs. Littlejohn learned that earlier in the year, three of A.G.'s friends had stated that they were transgender. She also observed that A.G. was receiving text messages from transgender friends.

46.     LCS counselors were available for students who were having difficulty with COVID-19 remote learning. A.G. began working with Shellie Rogers, one of the LCS counselors, in spring 2020.

47.     When A.G. expressed confusion about her gender, Plaintiffs informed Mrs. Rogers, who agreed to continue working with A.G. while Plaintiffs looked for another counselor.

48.     Plaintiffs found a new counselor who began seeing A.G. in summer 2020. Mrs. Littlejohn informed Mrs. Rogers about the new counselor.

49.     As the school year approached, A.G. asked her parents to permit her to change her name to "J." and to use "they/them" pronouns. Plaintiffs did not agree to make those changes at home. Plaintiffs said that A.G. could use J. as a "nickname" at school but would continue to be referred to as A.G. and a female.

50.    On August 27, 2020, Mrs. Littlejohn emailed A.G.'s new math teacher, Rima Kelley. Mrs. Littlejohn told Mrs. Kelley that A.G. had expressed confusion about her gender last spring, that the family was working on the issue including seeing a private counselor, that Plaintiffs did not consent to A.G.'s request to change her name and pronouns, but that A.G. could use J. as a "nickname" with classmates and teachers if she desired. Mrs. Littlejohn also told Mrs. Kelley she thought A.G.'s gender confusion was a direct result of her friend group.

51.    Mrs. Kelley replied that she would "try my very best to call them [sic.] J. Would you like me to share this with J.'s other teachers? Or are you telling them?" Mrs. Kelley further said that if A.G. really wanted to "do this we really need to tell them.  I can do it for you if you'd like. I am even the SAFE SPACE ally for Deerlake for LGBTQ students."

52.    Mrs. Littlejohn did not authorize Mrs. Kelley to tell other teachers, or anyone else, about A.G. using "J." as a nickname.

53.    Mrs. Littlejohn was well-known to the staff at Deerlake Middle School and was frequently at school volunteering in the copy room and events. Mrs. Littlejohn was present at all 504 plan meetings with guidance at Deerlake Middle School. Mrs. Littlejohn was also presented the "Volunteer of the Year" award for Deerlake Middle School in 2019. Nevertheless, no one at Deerlake Middle School,

nor otherwise affiliated with LCS, ever said anything to her or Mr. Littlejohn about their daughter's request to use a different name and pronouns.

54.     Mr. and Mrs. Littlejohn would never have known what was transpiring between LCS staff and her daughter but for an offhand comment A.G. made on September 14, 2020 as she was getting into the car. A.G. told her mother that she had a meeting with several school officials, and she thought it was funny that they asked her what restroom she preferred to use as a result of changing her name.

55.     Mrs. Littlejohn emailed Rachel Thomas, the school counselor, said she had serious concerns about A.G. being asked which restroom she wanted to use, reiterated that she did not want A.G.'s name changed, and asked for a meeting.

56.     Mrs. Thomas and Robin Oliveri, the assistant principal at Deerlake Middle School, called and informed Mrs. Littlejohn that they could not tell her anything about her daughter's September 8, 2020, meeting with LCS staff. Mrs. Thomas told Mrs. Littlejohn that she was not invited to the meeting because A.G., "by law" had to be the one to request her parents' attendance.  Mrs. Thomas told Mrs. Littlejohn that A.G. was now "protected" under a non-discrimination law that does not include parental notification or input. Mrs. Thomas told Mrs. Littlejohn that her only recourse was to "contact Dr. Kathleen Rodgers at the district who oversees the policy."

18

57.     On September 18, 2020, Mrs. Littlejohn sent an email to Dr. Rodgers, saying in pertinent part:

> My daughter had a transgender meeting last week with multiple school officials.  Her father and I were not invited or notified of the meeting, which Mrs. Thomas explained is due to a state statute protecting transgender individuals.  My daughter told me she was not asked if she wanted a parent there, which is extremely upsetting to me as her parent. She has a 504 plan for her ADHD and we have been very involved in that process due to her inattention and focus issues.
>
> Her father and I have been supportive since she told us she was having gender identity issues in March and she has been seeing a counselor to help her process her feelings and seek help in understanding what she is going through.  My child is not opposed to having a parent involved so what do we need to do moving forward for her father or I to be present at these meetings and be involved in the plans? Just so you are aware, she is the fourth child in her friend group at Deerlake to change her name and gender identity. She has never expressed these feelings before March during quarantine. Her father and I are taking this very seriously and would like to be involved in any school plans.

58.     Dr. Rodgers responded to Mrs. Littlejohn that she was not familiar with her child's case but that based on what Mrs. Littlejohn said the parents would be permitted to be in the meetings. She said she trusted that LCS staff would work to include the parents in future meetings.

59.     After hearing nothing further from LCS for nearly a month, on October 14, 2020, Mr. Littlejohn sent an email to Dr. Rodgers reiterating the facts as he knew them at the time. He also expressed the parents' concerns raised by LCS's interactions with A.G.:

I have several significant concerns about this situation. Our daughter is 13 years old and a minor. We are her natural parents and legal guardians. Our daughter is diagnosed with ADHD and has an active "504 Plan" on file with the school. Our daughter is also in counseling as a result of a referral by, or at least in consultation with, the school's guidance counselor. My wife and I have met with her counselor, and we have learned from her that it is common in children with ADHD to experience developmental delays in emotional maturity, among other things. In fact, our counselor believes that our daughter exhibits the emotional maturity of a typical 10 or 11 year old child.

For all of these reasons, we find it incredible that she was given the opportunity to advocate for herself in this instance, without our knowledge or opportunity to participate. If it is in fact the school's position that it has the legal authority to conduct such business directly and confidentially with minors and without parental notice or consent, please send us the specific law, rule, or published policy reference that supports such a position. Further, we would like to be provided with any and all school records and other documents related to the meeting, a copy of the minutes of the meeting or, absent such minutes, a written summary of the meeting provided by a school official who was present at the meeting. If there is a law, rule, or published policy that prevents these records from being provided to us, please cite the specific authority.

Finally, regarding the physical safety of our female child while at Deerlake, we have significant concerns and many questions related to her being given the opportunity to use the boy's restrooms. I realize that this statement is based only on our daughter's account of the meeting, and the reality may be different. Regardless, we would like to know exactly what was offered to our 13 year old female child on this subject, along with any additional limitations, conditions or precautions the school offered or was prepared to provide for our child, without our knowledge or consent. If there is a written school or District policy on the subject of "restroom preference," please provide it to us.

60.    Dr. Rodgers did not respond to the email. Mr. Littlejohn called Dr.

Rodgers on October 29, 2020 and again asked for the specific Leon County school

policy that allowed school officials to meet with their minor daughter without their consent. Dr. Rodgers said she would get the guideline to him. Mr. Littlejohn reiterated the parents' discontent and concern that the school spoke with their minor daughter about her bathroom preference, which is a safety issue.

61.    In response to Mr. Littlejohn's expression of concern about school staff meeting privately with his daughter, Dr. Rodgers requested permission to continue to have LCS staff meet privately with A.G. in order to get more information. Mr. Littlejohn said no.

62.    Later that day, Dr. Rodgers emailed Mr. Littlejohn to say that she had spoken to Deerlake Middle School principal Stephen Mills who agreed to meet with the Littlejohns.

63.    Meanwhile, Mr. and Mrs. Littlejohn learned that A.G. was getting a lot of positive attention and reinforcement for her "gender identity choice" to be called "J." and use they/them pronouns. They learned that several teachers, including Mrs. Kelley, were praising A.G. for being "brave."

64.    On November 2, 2020, Mr. and Mrs. Littlejohn met with Mr. Mills who provided them with a copy of the Student Support Plan that had been created for A.G. by LCS staff on September 8, 2020 without her parents' knowledge, participation, or consent. Mr. Mills did not provide Mr. and Mrs. Littlejohn with the requested legal authority that permitted LCS to meet with their daughter or create

such a plan without their knowledge or consent. Notably, Mr. Mills did not refer Mr. and Mrs. Littlejohn to the LCS Website for a digital copy of the Guide, nor print out a copy of the Guide for them.

65.     Mr. Mills told Mr. and Mrs. Littlejohn that, again without notifying them and in disregard of the extensive correspondence that had transpired between Plaintiffs and LCS staff, LCS had scheduled a private follow up meeting with their daughter for November 3, 2020 to further discuss her Student Support Plan. Scheduling this meeting without notifying the Littlejohns was a further disregard of their parental rights and their explicit directions that they be included in any future meetings. It also contradicted Dr. Rodgers' promise that LCS staff would work to include the parents in any further meetings.

66.     Mr. Mills told Mr. and Mrs. Littlejohn that they could be present at the meeting. Mr. and Mrs. Littlejohn requested that the meeting be cancelled and requested that no further meetings regarding her gender identity be scheduled.

67.     Mrs. Littlejohn informed Mr. Mills that LCS's actions had harmed their relationship with their daughter and that they did not want any more private meetings that might disrupt their attempt to repair the relationship. Mrs. Littlejohn specifically requested that she be informed if A.G. expressed anything about gender identity to the teachers or counselors.

68.     Since Mr. Mills had failed to respond to their request for legal authority for LCS's actions, Mr. Littlejohn emailed Dr. Rodgers and again requested "any written law, rule, policy and/or guidance on the process of school officials meeting with children about LGBTQ (or any other) issues without parental knowledge or consent."

69.     Dr. Rodgers did not respond. On November 6, 2020 Mr. Littlejohn sent another email repeating the request and indicating that he was ready to take further action to obtain the information.

70.     Dr. Rodgers responded and told Mr. Littlejohn, "We currently do not have any Florida specific law **that obligates us to inform the parents or says we cannot listen to the student without their parent present**. However, we do want to create a safe space for the student and honor their right to privacy while at the same time encourage their parent involvement in their support system as it relates to their issue – in this case one that is an orientation of non-binary." Dr. Rodgers did not explain how LCS intended to encourage parent involvement without informing parents that there is an issue related to their child's gender identity.

71.     After receiving the copy of A.G.'s Student Support Plan on November 2, 2020 Mr. and Mrs. Littlejohn for the first time learned what had been transpiring without their knowledge between LCS staff and their 13-year-old daughter since August 27, 2020 when Mrs. Littlejohn told Mrs. Kelley that A.G. was experiencing

confusion about her gender identity, which was being addressed by her parents through work with a private counselor. Mrs. Littlejohn had told Mrs. Kelley that they had not consented to A.G.'s request to change her name and pronouns but said that A.G. could use "J." as a "nickname" while the family was working through the issue.

72.    Unbeknownst to Mr. and Mrs. Littlejohn until November 2, 2020, A.G.'s request to change her name with the guidance counselor unleashed a flurry of activity aimed at secretly affirming A.G.'s belief that she was nonbinary and was to be called "J." and be referred to by the pronouns "they/them" by all of A.G.'s teachers in direct contravention of her parents' decisions and direction to school staff.

73.    Mr. and Mrs. Littlejohn learned that their daughter met with Veronica France, Taita Scott, and Rachel Thomas on September 8, 2020. The Student Support Plan indicated A.G.'s parents were not aware and supportive of A.G.'s "gender transition," so that staff needed to "engage in privacy" when speaking with them. In other words, LCS staff were directed to conceal from Mr. and Mrs. Littlejohn that their daughter was claiming to be "nonbinary."

74.    Mr. and Mrs. Littlejohn also learned that as of September 8, 2020 teachers and staff at Deerlake Middle School had been told that A.G. identified as "nonbinary" and of her preferred name and pronouns. Staff had also been directed

to not use her preferred name or gender specific pronouns when talking to A.G.'s parents.

75.    Mr. and Mrs. Littlejohn learned that their daughter indicated on September 8, 2020, that she wanted to use the female restroom. However, Dr. Rodgers had already directed staff that it was up to the child to make the choice, so A.G. could change her mind and could begin using the male restroom at any time without her parents' knowledge.

76.    Mr. and Mrs. Littlejohn were also shocked to learn that their 13-year-old daughter indicated at the September 8, 2020, meeting with LCS staff, that she was "comfortable with" rooming with either boys or girls on overnight trips.

77.    On or about November 6, 2020, Mr. and Mrs. Littlejohn for the first time became aware of the existence and contents of the Guide and the attached Student Support Plan form.

78.    Despite numerous requests for the authority under which LCS was operating in meeting with children without parental notice and consent, Mr. and Mrs. Littlejohn were never provided with a link to the Guide on the LCS Website. Mr. Mills emailed excerpts from the Guide on November 2, 2020 but did not offer a copy or a link. In her November 2, 2020 and November 6, 2020 emails Dr. Rodgers did not provide a link or even inform the Littlejohns that the Guide was available online. Instead, Dr. Rodgers sent a hard copy of the Guide through the mail. After receiving

the hard copy, Mr. Littlejohn did a search on the LCS website and discovered a link to the Guide on Dr. Rodgers' Equity and Diversity Department page.

79.    Mr. and Mrs. Littlejohn were shocked to learn that the Guide deliberately and intentionally directed LCS staff and personnel to disregard parental rights by NOT telling parents when their children asserted a discordant gender identity.

80.    Mr. and Mrs. Littlejohn were shocked to learn that the Guide and Plan gave children like their 13-year-old daughter authority to determine whether their parents would be informed of their gender identity decisions, including giving children the authority to decide which sex-separated privacy facilities they would use and with which sex they would room on overnight trips.

81.    Mr. and Mrs. Littlejohn were shocked to learn that the Guide and Plan actually directed LCS staff to deceive parents by telling staff to use different names and pronouns to refer to children in the presence of their parents than were used to refer to the children at school.

82.    On November 9, 2020, Mr. Littlejohn emailed Mr. Hanna to request a meeting regarding the Guide and the unconsented to interactions with their daughter. Mr. Littlejohn said "[W]e cannot understand the District's current policies regarding students changing their gender identities without parental notice or consent. It is particularly troubling to us that the District policy also prohibits school staff from

disclosing this information to parents and in some circumstances, actually directs the deception of parents by using different names and pronouns around parents than at school."

83.     Mr. and Mrs. Littlejohn met with Mr. Hanna on December 14, 2020. They informed Mr. Hanna about what had transpired with their daughter at Deerlake Middle School. They provided Mr. Hanna with information regarding Rapid Onset Gender Dysphoria, a social contagion phenomenon in which teenagers, particularly young girls who had never expressed confusion about their gender suddenly, like A.G., join with other friends in declaring that they no longer identify as a girl.[8]

84.     Mr. and Mrs. Littlejohn also provided Mr. Hanna with information regarding parental rights laws in Florida and told him that what transpired with their daughter was a huge violation of their parental rights.

85.     Mrs. Littlejohn is a licensed mental health counselor. She quoted statistics from the Guide to Mr. Hanna that indicate the transgender population is at an increased risk of suicide, yet nowhere on the Student Support Plan is there a question about whether the student is having thoughts of self-harm or seeking therapy for potential mental health issues. Mrs. Littlejohn told Mr. Hanna that by not notifying the parents of transgender/discordant gender children about their child's

---

[8]     Lisa Littman, *Parent reports of adolescents and young adults perceived to show signs of a rapid onset of gender dysphoria*, PLoS ONE 13(8): e0202330 (2018), https://journals.plos.org/plosone/article?id=10.1371/journal.pone.0202330

gender identity issues, LCS is assuming responsibility for the mental health and physical health of those children. She then pointed out the inherent conflict between the policy of willful shielding of a child's LGBTQ status from their parents in the name of privacy, while simultaneously recognizing the increased suicide risk of LGBTQ-identified children. This policy of secrecy stands in stark contrast to the fundamental principles of suicide prevention and effectively prevents potentially at-risk children from accessing mental health services, which necessitate parental guidance and require parental consent.

86.    Mr. and Mrs. Littlejohn told Mr. Hanna that LCS is unjustifiably assuming that all parents are non-supportive of their children's gender identity issues and letting children decide whether their parents are "supportive," without defining "supportive" or investigating whether what the children are saying is accurate. Statements by Board Chairwoman Bowen and Dr. Rodgers, as well as the Guide confirm that LCS is indeed granting minors the authority to make what are essentially mental health decisions without consulting their parents.

87.    Mr. and Mrs. Littlejohn expressed concern that LCS's directives and practice are cutting parents out of very important, potentially life-altering decisions about their children in derogation of the constitution and Florida law.

88.    Mr. Hanna apologized for how the situation was handled. He told the Littlejohns he would consult with legal counsel and follow up.

89.     Mr. Hanna and Dr. Rodgers met with Mr. and Mrs. Littlejohn on January 25, 2021. Mr. Hanna said that he would revise the Guide to say that if any student wants to change his/her name and/or gender identity, the parent must be notified unless there is concern the child is being abused, defined by imminent physical danger.  Mr. Hanna said that the revision would say that in the case of suspected abuse, the school official will contact the Department of Children and Families ("DCF"). Mr. Hanna represented to the Littlejohns that he had already given his administrators the change verbally and would be providing training within 30 days.

90.     Mr. and Mrs. Littlejohn asked to see the proposed amendment in writing and that it be posted on the LCS website as an amendment to the existing Guide.

91.     Mr. and Mrs. Littlejohn did not receive any written confirmation of the amended directive promised by Mr. Hanna, and there were no changes made to the Guide on the LCS website by March 3, 2021. Mr. and Mrs. Littlejohn were also informed that LCS counselors and teachers were not told that the directive regarding parental notification had been changed to provide that parents would be notified.

92.     Meanwhile, unbeknownst to Mr. and Mrs. Littlejohn, on February 25 and 26, 2021, Ms. Bowen was touting the development of the Guide, Student Support Plan, and the associated district protocols as success stories and non-

affirming parents as challenges for LCS with respect to LGBTQ+ students at the All Together Now conference.

93.     Dr. Rodgers also participated in the All Together Now conference and stated that teachers create culture and climate in the classroom to make students feel accepted. She said that students need to be able to show their "identities" to their teachers and for their peers to embrace those identities.[9] She did not say anything about parental consent to their children's "identities" being announced and embraced.

94.     Having received no response from Mr. Hanna, on March 3, 2021, Mrs. Littlejohn emailed Dr. Rodgers who, in turn, offered the following response:

> As previously discussed, there is no specific policy that addresses our transgender or nonconforming population, but they are covered under our nondiscrimination policy as well as any student that identifies in the LGBTQ+ population. Our nondiscrimination policy basically states that we do not discriminate against individuals based on sex/sexual orientation. In keeping in that vein, we strive to make sure that all of our students and employees feel safe and supported within our school district.
>
> I have addressed with principals, assistant principals for administration and deans that unless there is some imminent danger to the student's wellbeing (physical harm, abuse, etc.) they are **encouraged** to inform parents and convene a meeting with them and their student when they have been apprised of a name change or other request related to LGBTQ+ population.

---

[9]     https://www.youtube.com/watch?v=KnCG2qJCc1s&list=
PLUWXEguBhw7yBHiPXADDAc6tGtsvkNlDe&index=10 at 7:50.

We continue to engage our administrators in collegial conversations that are germane to the LGBTQ+ population focusing on nondiscriminatory practices that would create an inclusive and tolerate [sic.] culture and climate. Administrators in turn would share this information with their teachers and staff to make sure that compliance with district's expectations are met.

95.    On March 8, 2021, Mr. Littlejohn emailed Mr. Hanna, saying, *inter alia*:

We were under the clear impression from our last meeting that the written support guide and transgender support plan would be revised to remove the current instructions to exclude parents and replace them with instructions to contact parents when any student requests to change his/her name and/or gender. We further understand that, in the rare cases of suspected or imminent harm to the student from his/her parents, the school would first contact DCF.

Being verbally "encouraged" to inform parents is not sufficient, in our minds, when published guidance still clearly directs the exclusion of parents....

Our clear understanding from you is that the above guidance would be repealed or amended to indicate that informing the parents would be mandatory, with the sole exception noted above, and this mandate would be reflected in any/all District publications on this matter. Please let us know if we misunderstood your intention regarding the attached guidance at the last meeting.

96.    On March 9, 2021, Mr. Hanna responded that he would speak with Dr. Rodgers and follow up. Mr. Hanna never followed up.

97.    On May 11, 2021, Mr. and Mrs. Littlejohn's counsel sent a letter to Mr. Hanna and Board Chairwoman Bowen. By this time, the Parents' Bill of Rights, HB 241, had passed the Florida Legislature and was awaiting Governor DeSantis'

31

signature. The letter referenced HB 241, pointing out that the Guide and LCS's actions in accordance with the Guide, particularly the interactions with A.G., would be violations of the Parents' Bill of Rights. The letter also described the other statutory and constitutional violations arising from LCS's actions and requested that LCS rescind the Guide and publish amended guidance that parents will be notified when their children express issues with their gender identity.

98.     As stated in the letter, the actions of Defendants have caused great harm to Plaintiffs and their daughter, including exacerbation of psychological challenges for A.G., and disruption of the privacy and integrity of their family.

> The district has driven a wedge between A.G. and her parents, sending the message that her parents cannot be trusted and do not support her best interests. The rift created by the district between A.G. and her parents is profound and unlikely to be fully rectified. By cutting the Littlejohns out of the decision-making process for A.G., the district has made itself responsible for the risks to A.G.'s mental health resulting from the district's affirmation of A.G.'s gender confusion. the district has profoundly harmed a teenage girl whom the district knew to have learning difficulties and emotional delays. District staff have reinforced A.G.'s belief that she is "non-binary," even telling the whole class to reaffirm her announcement that she is "non-binary." This powerful reinforcement of a discordant psychological belief furthers the rift between A.G. and her parents, whom she will perceive as unloving, non-supportive and "transphobic. It will be nearly impossible to fully reverse this profound psychological and emotional damage.

99.     Mr. Hanna responded in a letter dated May 25, 2021, stating that the Guide was being revised and the question and answer section which contains the directive regarding parent notification was being revised. Mr. Hanna represented that

administrators had been given a revised version of the section that provided for parental notice. However, there was nothing posted on the website nor sent to parents regarding the amendment. As of June 30, 2021, the Guide remained posted on the website without change.

100.   The Parents' Bill of Rights was signed by Governor DeSantis and became law on July 1, 2021. On that same day, Mr. and Mrs. Littlejohn and their counsel met with Mr. Hanna, Dr. Rodgers and their counsel.

101.   At the meeting, Dr. Rodgers represented that the Guide had been removed from the website to be revised. However, it was still on the site unchanged when the meeting began. Mr. and Mrs. Littlejohn's counsel informed Dr. Rodgers that it was still on the site. Within the next few minutes, the Guide was removed from the publicly accessible portion of the website.

102.   The Littlejohns repeated their request that the Guide be rescinded, that LCS publish on the Website a written statement that parents would be notified when their child/children express a discordant gender identity and included in meetings or discussions with their child/children regarding their gender identity. The Littlejohns also requested that as Mr. Hanna promised, LCS staff would be trained on the new guidance providing for parental notification.

103.   LCS staff and counsel stated that they were working on new guidance and on procedures to comply with the Parents' Bill of Rights.

104.   The Littlejohns' counsel offered to provide some proposed language for LCS to consider, and to provide resources on addressing transgender issues. That information was sent to Mr. Hanna, Dr. Rodgers, and their counsel on July 26, 2021.

105.   Defendants did not respond, and on August 9, 2021, Plaintiffs' counsel asked about the status. Dr. Rodgers responded on August 10, 2021 that LCS would provide a response the next day. No response was ever received.

106.   There is no indication on the website or otherwise that the Guide has been rescinded, only a notation that it is being revised. No revised guidance regarding parental notification has been published or provided to Plaintiffs.

107.   Plaintiffs are informed and believe and based thereon allege that LCS counselors have not been instructed by LCS administration that the Guide has been rescinded and have not been instructed of any interim alternative guidance requiring that parents be notified when their children claim to have a discordant gender identity.

108.   To the contrary, Plaintiffs are informed and believe and based thereon allege, that Defendants are continuing to disregard parental rights by encouraging teachers and other staff to participate in Equality Florida's "Safe Space" initiative under which teachers and counselors promise that if a child expresses a discordant gender identity the staff member will "be familiar with a student's right to privacy, where you do not disclose identity to others."

34

109.   Plaintiffs are informed and believe and based thereon allege that as recently as September 28, 2021, LCS staff were instructing other staff that "privacy laws" prohibited teachers from revealing to parents that their child has expressed a discordant gender identity.

110.   Plaintiffs are informed and believe and based thereon allege that as recently as September 29, 2021, LCS staff were being instructed that they should not "out" children to their parents by notifying parents when their children state a belief that they have a discordant gender identity.

111.   Ongoing email correspondence between LCS staff members demonstrates that Defendants have failed to train staff that parents are to be notified when their children express confusion about their gender identity. This failure to train staff is an ongoing violation of the Parents' Bill of Rights, other Florida statutes and the state and federal constitutions.

112.   Despite the enactment of the Parents' Bill of Rights, Defendants have failed and refused, and continue to refuse, to publicly rescind the Guide and its directives prohibiting parental notification and promoting concealment and deception.

113.   Despite the enactment of the Parents' Bill of Rights, Defendants have failed and refused, and continue to refuse, to publicly rescind the use of the Student Gender Support Plan that conditions notification of parents of their child/children

35

expressing gender confusion or a desire to use privacy facilities or sleeping quarters used by the opposite sex on a minor student's authorization.

114.   Despite enactment of the Parents' Bill of Rights Defendants have failed and refused, and continue to refuse, to provide Plaintiffs and other parents of children in LCS schools written confirmation that they will be notified when their children express distress or confusion regarding their sex or gender identity and request changes to their identification, privacy facility usage, or sleeping quarters on field trips.

115.   Unless and until Defendants publicly a) rescind the Guide, b) cease distributing the Guide to staff, including through third parties c) cease using the Student Support Plan, d) cease communicating to LCS staff that parents are not to be notified, and e) confirm that parents will be notified of gender identity issues related to their children, Plaintiffs' fundamental rights to direct the upbringing of their children, to make decisions regarding their children's medical and mental health, and right of familial privacy will continue to be violated.

116.  Defendants' ongoing violation of Plaintiffs' fundamental parental rights have caused and will continue to cause irreparable harm unless and until Defendants: a) rescind the Guide, b) cease distributing the Guide to LCS staff directly or indirectly through third parties, c) cease using the Student Support Plan, d) put in place a policy directing that LCS staff will notify parents when their

children claim to have a discordant gender identity and include parents in all discussions regarding their children's gender identity, e) train all staff in the alternative guidance, and f) notify all parents whose children have expressed confusion about their gender identity and had a Student Support Plan developed without parental notice and involvement of the actions taken with their children.

117.   As a direct result of Defendants' actions and their deliberate indifference to Plaintiffs' parental rights, Plaintiffs and their daughter have suffered and are continuing to suffer, *inter alia,* a) emotional distress, b) exacerbation of A.G.'s psychological and educational challenges requiring increased counseling and other interventions, c) ongoing emotional and psychological damage to their family dynamic, requiring therapeutic interventions to rebuild trust between parents and child which was damaged by the actions of Defendants, d) increased costs for providing alternatives for A.G. in order for her to receive an appropriate education untainted by ideological distractions which exacerbate her developmental challenges and diminish her academic potential.

**FIRST CAUSE OF ACTION**
**VIOLATION OF CIVIL RIGHTS, 42 U.S.C. § 1983**
**(Violation of Plaintiffs' Substantive Due Process Right to Direct the Education and Upbringing of Their Children under the U.S. Constitution)**
**(Against all Defendants)**

118.   Plaintiffs incorporate all of the preceding allegations by reference as if set forth in full.

119.   The Due Process Clause in the 14th Amendment to the United States Constitution protects the fundamental right of parents to make decisions concerning the care, custody, and control of their children. *Troxel v. Granville*, 530 U.S. 57, 68 (2000)

120.   Defendants' violated Plaintiffs' fundamental right to make decisions regarding the custody, care and control of their children when it adopted the Guide, Student Support Plan and their directives, *inter alia,* that a) parents are not to be notified if their children express confusion regarding their sex or gender identity; b) parents are presumed to pose a danger to their child's health and well-being if notified of their child's gender confusion or discordant gender identity; c) parents are not to be included in meetings with their children to discuss changes made in response to the children's assertion of a discordant gender identity unless the children consent; d) parents are not to be told about changes to their children's names, pronouns, gender identifiers, and school records without the children's consent; e) parents are to be lied to when school staff discuss their children, in that staff are to use the children's legal name when communicating to or around parents but not in other circumstances; f) children are to be permitted to decide which privacy facilities they will use and with which sex they will room on overnight trips.

121.   Adoption of the Guide and its directives represent a *de facto* policy of Defendant School Board that affects the entire school district, as affirmed by

38

Chairwoman Bowen's statement that the Guide and its directives were among the successes that the Board enjoyed in its efforts to increase equity and access for LGBTQ+ students.

122. Implementation of the Guide and its directives with respect to Plaintiffs' daughter and continuing implementation of the Guide with other LCS students result from the School Board's *de facto* policy, practice and custom and the actions of Superintendent Hanna, who was elected by the people of Leon County to oversee the administration of Leon County Schools.

123. Implementation of the Guide and its directives with respect to Plaintiffs' daughter and continuing implementation of the Guide with other LCS students resulted from the School Board's *de facto* policy, practice and custom and the actions of Dr. Kathleen Rodgers, who as Assistant Superintendent for Equity and Diversity had the authority, under the supervision of Superintendent Hanna, to develop and implement district policies related to LGBTQ+ students and to train district staff regarding said policies. Dr. Rodgers did in fact instruct LCS staff to conceal information related to their children's gender identity from parents, that state and federal law prevented parents from being informed of their children's gender identity issues without the children's consent, and that staff would be subject to harassment charges if he or she notified parents or otherwise failed to maintain secrecy regarding a minor child's gender identity issues.

124. Defendants acted with deliberate indifference to Plaintiffs' fundamental parental rights enacting the Guide and its directives which explicitly and intentionally excluded parents from significant decision-making related to their children.

125. Defendants further acted with deliberate indifference to Plaintiffs' fundamental rights by disregarding Plaintiffs' instructions that no further meetings were to be scheduled with their daughter without their knowledge and consent.

126. Defendant Rodgers acted with deliberate indifference to Plaintiffs' fundamental rights by requesting a private meeting with Plaintiffs' daughter immediately after being informed that Plaintiffs did not consent to further meetings with their daughter

127. Defendants further acted with deliberate indifference to Plaintiffs' fundamental rights by failing and refusing to rescind the Guide and revise the directives that excluded parents from decisions regarding their children's gender identity even after promising to do so and after being informed that they violated Plaintiffs' rights.

128. Defendants' deliberate indifference to Plaintiffs' rights resulted in deprivation of their fundamental constitutional rights.

129. Plaintiffs' constitutionally protected right to direct the upbringing and education of their children was violated as the plainly obvious consequence of

Defendants' actions in drafting, implementing and failing to rescind written guidance and concomitant staff training that intentionally and explicitly directed that parents were not to be notified when their children expressed a discordant gender identity and wanted to affirm that identity, that information was to be concealed from parents and that staff was to lie to parents.

130.   Defendants cannot assert a compelling interest for disregarding Plaintiffs' long-established fundamental constitutional right to direct the upbringing and education of their children, and Defendants' explicit prohibition against parental notification is not narrowly tailored.

131.   Defendants' violation of Plaintiffs' fundamental constitutional rights has caused and continues to cause Plaintiffs undue hardship and irreparable harm.

132.   Plaintiffs have no adequate remedy at law to correct the continuing deprivation of their fundamental rights.

## SECOND CAUSE OF ACTION
## VIOLATION OF CIVIL RIGHTS, 42 U.S.C. § 1983

**(Violation of Plaintiffs' Fundamental Right to Direct the Medical and Mental Health Decision-making for Their Children Under the U.S. Constitution) (Against all Defendants)**

133.   Plaintiffs incorporate all of the preceding allegations by reference as if set forth in full.

134.   The Due Process Clause in the 14th Amendment to the United States Constitution protects the fundamental right of parents to direct the medical and

mental health decision-making for their children. *Parham v. J. R.*, 442 U.S. 584 (1979).

135.  By excluding parents from discussions regarding their child's/children's assertion of a discordant gender identity and adopting protocols aimed at secretively affirming the discordant gender identity, Defendants are making, and in Plaintiffs' case, have made. decisions that affect the mental health of their child in contravention of Plaintiffs' fundamental rights.

136.  Defendants have usurped Plaintiffs' responsibility for the health and well-being of their children and sought to supplant their authority for Plaintiffs' authority as fit parents to be the ultimate decisionmakers regarding the physical and mental health of their child, including decisions related to their child's confusion or distress about her sex or gender identity.

137.  Defendants violated Plaintiffs' fundamental right to make decisions regarding the mental health of their children by adopting the Guide, Student Support Plan and their directives, *inter alia,* that a) parents are not to be notified if their children express a discordant gender identity; b) parents are presumed to pose a danger to their child's health and well-being if notified of their child's gender confusion or discordant gender identity; c) parents are not to be included in meetings with their children to discuss changes to be made in response to the children's assertion of a discordant gender identity unless the child consents; d) parents are not

to be told about changes to their children's names, pronouns, other identifiers, and school records without the children's consent; e) parents are to be lied to when school staff discuss their children, in that staff are to use the children's legal name when talking to parents but not in other circumstances; f) children are to be permitted to decide which privacy facilities they will use and with which sex they will room on overnight trips.

138.   Affirming a child's discordant gender identity involves significant mental health and medical decisions affecting the well-being of children with potentially life-long consequences. Therefore, by excluding parents from discussions regarding their child's/children's assertion of a discordant gender identity and adopting protocols aimed at secretively affirming the discordant gender identity, Defendants are making, and in Plaintiffs' case, have made. decisions that affect the mental health of their child in contravention of Plaintiffs' fundamental rights.

139.   Plaintiffs incorporate by reference the allegations of Paragraph 121 as if set forth in full.

140.   Plaintiffs incorporate by reference the allegations of Paragraph 122 as if set forth in full.

141.   Plaintiffs incorporate by reference the allegations of Paragraph 123 as if set forth in full.

142. Defendants acted with deliberate indifference to Plaintiffs' fundamental parental rights by enacting the Guide and its directives which explicitly and intentionally excluded parents from decision-making related to their children's mental health, *i.e.*, their children's belief that they have a gender identity that differs from their sex.

143. Plaintiffs incorporate by reference the allegations of Paragraph 127 as if set forth in full.

144. Defendants' deliberate indifference to Plaintiffs' rights resulted in deprivation of their fundamental constitutional rights to direct the medical and mental health decision-making for their children.

145. Plaintiffs' constitutionally protected right to direct the medical and mental health decision-making for their children was violated as the plainly obvious consequence of Defendants' actions in drafting, implementing and failing to rescind written guidance and concomitant staff training that intentionally and explicitly directed that parents were not to be notified when their children said they had a discordant gender identity and wanted to affirm that identity, that information was to be concealed from parents and that staff was to lie to parents.

146. Defendants cannot assert a compelling state interest for disregarding Plaintiffs' long-established fundamental constitutional right to make medical and

mental health care decisions for their children, and Defendants' explicit prohibition against parental notification is not narrowly tailored.

147.   Defendants' violation of Plaintiffs' fundamental constitutional rights has caused and continues to cause Plaintiffs undue hardship and irreparable harm.

148.   Plaintiffs have no adequate remedy at law to correct the continuing deprivation of their fundamental rights.

### THIRD CAUSE OF ACTION
### VIOLATION OF CIVIL RIGHTS, 42 U.S.C. § 1983

**(Violation of Plaintiffs' Right to Familial Privacy Under the U.S. Constitution)**
**(Against all Defendants)**

149.   Plaintiffs incorporate all of the preceding allegations by reference as if set forth in full.

150.   The Due Process Clause in the 14th Amendment to the United States Constitution protects the sanctity of the family as an institution deeply rooted in this Nation's history and tradition through which moral and cultural values are passed down. *Moore v. East Cleveland*, 431 U.S. 494, 503-04 (1977). The Constitution protects the private realm of the family from interference by the state. *Prince v. Massachusetts*, 321 U.S. 158, 166 (1944).

151.   In adopting and implementing the directives in the Guide, and particularly in implementing the directives with Plaintiffs' daughter with no notice to or consent by Plaintiffs, Defendants have impermissibly injected themselves into

the private realm of Plaintiffs' family by usurping Plaintiffs' rights to make decisions regarding their children's well-being.

152.   Defendants have violated Plaintiffs' constitutional right to privacy in familial matters by adopting and implementing the Guide, Student Support Plan, and their directives, *inter alia,* that a) parents are not to be notified if their children express confusion regarding their  gender identity unless their children consent; b) parents are presumed to pose a danger to their child's health and well-being if notified of their child's gender confusion or discordant gender identity; c) parents are not to be included in meetings with their children to discuss changes to be made in response to the children's assertion of a discordant gender identity unless the children consent; d) parents are not to be told about changes to their children's names, pronouns, other identifiers, and school records unless the children consent; e) parents are to be lied to when school staff discuss their children in that staff are to use the children's legal name when talking to parents but not in other circumstances; f) children have the unilateral authority to decide which privacy facilities they will use  and with which sex they will room on overnight trips.

153.   Defendants have infringed Plaintiffs' right to family privacy by prompting Plaintiffs' daughter to consider whether her parents "support" her sufficiently to participate in decision-making related to her belief that she is not a girl. Defendants have sown seeds of doubt within Plaintiffs' daughter's mind about

whether her parents are acting in her best interest, thereby creating a rift in the parent-child relationship that infringes Plaintiffs' right to family privacy.

154. Plaintiffs incorporate by reference the allegations of Paragraph 121 as if set forth in full.

155. Plaintiffs incorporate by reference the allegations of Paragraph 122 as if set forth in full.

156. Plaintiffs incorporate by reference the allegations of Paragraph 123 as if set forth in full.

157. Defendants acted with deliberate indifference to Plaintiffs' parental rights to family privacy by enacting the Guide, Student Support Plan, and their directives which explicitly and intentionally cast doubt on parents' support and ability to respond appropriately to their child's expression of a discordant gender identity and excluded parents from decision-making related to their child's proclaimed discordant gender identity.

158. Defendants' deliberate indifference to Plaintiffs' rights resulted in deprivation of their constitutional right to family privacy.

159. Plaintiffs' constitutionally protected right to familial privacy was violated as the plainly obvious consequence of Defendants' actions in drafting, implementing and failing to rescind written guidance and associated staff training that intentionally and explicitly directed that parents were not to be notified when

their children said that they had a discordant gender identity, information related to their children's gender identity was to be concealed from parents and that parents were to be lied to by staff when talking about their children.

160.   Defendants cannot assert a compelling state interest for disregarding Plaintiffs' constitutional right to familial privacy, and Defendants' explicit prohibitions against parental notification and involvement in children's mental and emotional health decisions are not narrowly tailored.

161.   Defendants' violation of Plaintiffs' constitutional rights has caused and continues to cause Plaintiffs undue hardship and irreparable harm.

162.   Plaintiffs have no adequate remedy at law to correct the continuing deprivation of their fundamental rights.

**FOURTH CAUSE OF ACTION**
**Violation of Plaintiffs' Right to Privacy Under Article 1, § 23 of the Florida Constitution.**
**(Against all Defendants)**

163.   Plaintiffs incorporate all of the preceding allegations by reference as if set forth in full.

164.   Plaintiffs, as Floridians, enjoy an explicit right of privacy under Article 1, § 23 of the Florida Constitution, which provides in pertinent part that "[e]very natural person has the right to be let alone and free from governmental intrusion into his private life."

165.   Under Article 1, § 23 of the Florida Constitution, "the State may not intrude upon the parents' fundamental right to raise their children except in cases where the child is threatened with harm." *Von Eiff v. Azicri*, 720 So.2d 510 (FL 1998).

166.   As set forth more fully *supra,* Defendants have intentionally intruded upon Plaintiffs' fundamental right to raise their children by drafting and implementing the Guide and its directives that exclude parents from decision-making about their children's assertion of a discordant gender identity, conceal information from parents regarding actions taken by LCS staff related to their child's asserted discordant gender identity, deceive parents about identifiers used to describe their children at school and other matters related to their child's asserted discordant gender identity and otherwise interfere with parents' ability to direct their children's upbringing.

167.   Defendants have intruded upon Plaintiffs' fundamental rights without any evidence that Plaintiffs' daughter is or will be threatened with harm if Plaintiffs are permitted to participate in decision-making related to her assertion of a discordant gender identity.

168.   Defendants cannot assert a compelling interest for disregarding Plaintiffs' fundamental constitutional right to raise their children, and Defendants'

explicit prohibition against parental notification and involvement is not narrowly tailored.

169.   Defendants' violation of Plaintiffs' fundamental constitutional rights has caused and continues to cause Plaintiffs undue hardship and irreparable harm.

170.   Plaintiffs have no adequate remedy at law to correct the continuing deprivation of their fundamental rights.

### FIFTH CAUSE OF ACTION
### (Violation of Plaintiffs' Right to Substantive Due Process under Art. I § 9 of the Florida Constitution)
### (Against all Defendants)

171.   Plaintiffs incorporate all of the preceding allegations by reference as if set forth in full.

172.   Art. I, § 9, Fla. Const., like the 14th Amendment to the U.S. Constitution, provides that "[n]o person shall be deprived of life, liberty or property without due process of law."

173.   Substantive due process under Art. I, § 9 of the Florida Constitution protects the "full panoply of individual rights" and in particular, the long-established fundamental right of parents to direct the upbringing of their children, from unwarranted encroachment by the government. *J.B. v. Fla. Dep't of Child. & Fam. Servs.*, 768 So. 2d 1060, 1063 (Fla. 2000).

174.   Defendants have encroached on Plaintiffs' fundamental right to make decisions regarding the custody, care and control of their children by adopting the

50

Guide, Student Support Plan, and its directives, *inter alia*, that a) parents are not to be notified if their children express a discordant gender identity; b) parents are presumed to pose a danger to their child's health and well-being if notified of their child's gender confusion or discordant gender identity; c) parents are not to be included in meetings with their children to discuss changes to be made in response to the children's assertion of a discordant gender identity unless the children consent; d) parents are not to be told about changes to their children's names, pronouns, other identifiers, and school records without the children's consent; e) parents are to be lied to when school staff discuss their children in that staff are to use the children's legal name when talking to parents but not in other circumstances; f) children are to be permitted to decide which privacy facilities they will use  and with which sex they will room on overnight trips.

175.   Adoption of the Guide and its directives represent a *de facto* policy of Defendant School Board, as affirmed by Chairwoman Bowen's statement that the Guide and its directives were among the successes that the Board enjoyed in its efforts to increase equity and access for LGBTQ+ students.

176.   Implementation of the Guide and its directives with Plaintiffs' daughter and continuing implementation of the Guide with other LCS students resulted from the School Board's *de facto* policy, practice and custom and the actions of

Superintendent Hanna, who was elected by the people of Leon County to oversee the administration of Leon County Schools.

177.   Implementation of the Guide and its directives with Plaintiffs' daughter and continuing implementation of the Guide with other LCS students resulted from the School Board's *de facto* policy, practice and custom and the actions of Dr. Kathleen Rodgers, who as Assistant Superintendent for Equity and Diversity had the authority, under the supervision of Superintendent Hanna, to develop and implement district policies related to LGBTQ+ students and to train district staff regarding said policies. Dr. Rodgers did in fact instruct LCS staff to conceal information related to their children's gender identity from parents, that state and federal law prevented parents from being informed of their children's gender identity issues without the children's consent, and that staff would be subject to harassment charges if he or she notified parents or otherwise failed to maintain secrecy regarding a minor child's gender identity issues.

178. Defendants   acted   with   deliberate   indifference   to   Plaintiffs' fundamental parental rights enacting the Guide and its directives which explicitly and intentionally excluded parents from decision-making related to their children.

179.   Defendants further acted with deliberate indifference to Plaintiffs' fundamental rights by disregarding Plaintiffs' instructions that no further meetings were to be scheduled with their daughter without their knowledge and consent.

180.   Defendant Rodgers acted with deliberate indifference to Plaintiffs' fundamental rights by requesting a private meeting with Plaintiffs' daughter immediately after being informed that Plaintiffs did not consent to further meetings with their daughter.

181.   Defendants further acted with deliberate indifference to Plaintiffs' fundamental rights by failing and refusing to rescind the Guide and revise the directives that excluded parents from decisions regarding their children's gender identity even after promising to do so and after being informed that they violated Plaintiffs' rights.

182.   Defendants' deliberate indifference to Plaintiffs' rights resulted in deprivation of their fundamental constitutional rights.

183.   Plaintiffs' constitutionally protected right to direct the upbringing and education of their children was violated as the plainly obvious consequence of Defendants' actions in drafting, implementing and failing to rescind written guidance and concomitant staff training that intentionally and explicitly directed that parents were not to be notified when their children said that they had a discordant gender identity and wanted to affirm that identity, that information was to be concealed from parents and that staff was to lie to parents.

184.   Defendants cannot assert a compelling interest for disregarding Plaintiffs' long-established fundamental constitutional right to direct the upbringing

and education of their children, and Defendants' explicit prohibition against parental notification is not narrowly tailored.

185.   Defendants' violation of Plaintiffs' fundamental constitutional rights has caused and continues to cause Plaintiffs undue hardship and irreparable harm.

186.   Plaintiffs have no adequate remedy at law to correct the continuing deprivation of their fundamental rights.

## SIXTH CAUSE OF ACTION
**(Violation of the Parents' Bill of Rights, Florida Statutes, Chapter 1014)**
**(Against Defendant School Board)**

187.   Plaintiffs incorporate all of the preceding allegations by reference as if set forth in full.

188.   Effective July 1, 2021, The Parents' Bill of Rights reserves all parental rights, including the rights to direct education, upbringing, moral or religious training and to make health care decisions for their minor children to parents "without obstruction or interference from the state, any of its political subdivisions, any other governmental entity, or any other institution. Florida Statutes § 1014.04.

189.   Florida Statutes § 1014.03 provides:

> The state, any of its political subdivisions, any other governmental entity, or any other institution may not infringe on the fundamental rights of a parent to direct the upbringing, education, health care, and mental health of his or her minor child without demonstrating that such action is reasonable and necessary to achieve a compelling state interest and that such action is narrowly tailored and is not otherwise served by a less restrictive means.

54

190.   Defendant School Board is a political subdivision of the state and a governmental agency subject to the Parents' Bill of Rights.

191.   Defendant School Board has enacted and implemented a *de facto* policy with directives that obstruct and infringe on the fundamental rights of Plaintiffs to direct the upbringing, education, health care and mental health of their children, as set forth more fully *supra*.

192.   Defendant School Board has not rescinded the directives in the Guide nor provided notification to Plaintiffs that the directives are no longer effective.

193.   Defendant School Board has not provided alternative directives to LCS staff which respect parental rights as required under the statute.

194.   Defendant School Board's agents are continuing to act in accordance with the infringing directives in, *inter alia*, inviting staff members to participate in a Safe Space program under which staff members promise to not reveal to parents when a student expresses a discordant gender identity and seeks accommodations unless permission is granted by the student.

195.   Defendant School Board, acting through Equality Florida, is continuing to distribute Student Support Plans with directives that students are a) authorized to determine whether their parents are "supportive" and thereby permitted to engage with school officials; b) authorized to unilaterally determine which sex-segregated privacy facilities and overnight accommodations they will use; c) authorized to

assume new name and pronoun preferences and insist that such preferences are concealed from parents. In so doing, LCS is using third parties to bypass parental notice and consent on issues related to children's upbringing and mental health, in violation of the Parents' Bill of Rights.

196.   Defendant School Board cannot assert a compelling interest for disregarding Plaintiffs' fundamental right to direct the upbringing and education of their children, and Defendant's prohibitions against parental notification are not narrowly tailored.

197.   Defendant School Board's violation of the Parents' Bill of Rights has caused and is continuing to cause harm to Plaintiffs.

## SEVENTH CAUSE OF ACTION

### (Violation of Plaintiffs' Right to Choose Medical Treatment for their Children Under Florida Statutes § 743.07)

### (Against all Defendants)

198.   Plaintiffs incorporate all of the preceding allegations by reference as if set forth in full.

199.   Under Fla. Stat. § 743.07 parents are responsible for selecting the manner of medical/mental health treatment received by their children until the children reach age 18. That fundamental right cannot be diminished or eliminated by state, city, or, in this case, school board enactments without a compelling state interest. *Vazzo v. City of Tampa*, 415 F.Supp.3d 1087, 1098 (M.D. Fla. 2019).

200. By excluding parents from discussions regarding their child's/children's assertion of a discordant gender identity and adopting protocols aimed at secretively affirming the discordant gender identity, Defendants are making, and in Plaintiffs' case, have made. decisions that affect the mental health of their child in contravention of Plaintiffs' fundamental rights.

201. Defendants have usurped Plaintiffs' responsibility for the health and well-being of their children and sought to supplant their authority for Plaintiffs' authority as fit parents to be the ultimate decisionmakers regarding the physical and mental health of their child, including decisions related to their child's confusion or distress about her sex or gender identity.

202. As set forth more fully, *supra*, Defendants' adoption of the Guide, Student Support Plan, and their directives, *inter alia,* that a) parents are not to be notified if their children express a discordant gender identity; b) parents are presumed to pose a danger to their child's health and well-being if notified of their child's gender confusion or discordant gender identity; c) parents are not to be included in meetings with their children to discuss changes made in response to the children's assertion of a discordant gender identity unless the children consent; d) parents are not to be told about changes to their children's names, pronouns and other identifiers without the children's consent; e) parents are to be lied to when school staff discuss their children in that staff are to use the children's legal name

when talking to parents but not in other circumstances; f) children are to be permitted to decide which privacy facilities they will use  and with which sex they will room on overnight trips violates Plaintiffs' fundamental right to make decisions regarding the mental health of their children.

203.   Affirming a child's discordant gender identity involves significant mental health and medical decisions affecting the well-being of children with potentially life-long consequences. Therefore, by excluding parents from discussions regarding their child's/children's assertion of a discordant gender identity and adopting protocols aimed at secretively affirming the discordant gender identity, Defendants are making, and in Plaintiffs' case, have made. decisions that affect the mental health of their child in contravention of Plaintiffs' fundamental rights.

204.   Plaintiffs' right to direct the medical and mental health decision-making for their children was violated as the plainly obvious consequence of Defendants' actions in drafting, implementing and failing to rescind written guidance and concomitant staff training that intentionally and explicitly directed that parents were not to be notified when their children said that had a discordant gender identity and wanted to affirm that identity, that information was to be concealed from parents and that staff was to lie to parents.

205.   Defendants cannot assert a compelling interest for disregarding Plaintiffs' long-established right to make medical and mental health decisions for their children, and Defendants' explicit prohibition against parental notification is not narrowly tailored.

206.   Defendants' violation of Plaintiffs' fundamental rights has caused and continues to cause Plaintiffs undue hardship and irreparable harm.

207.   Plaintiffs have no adequate remedy at law to correct the continuing deprivation of their fundamental rights.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request the following relief:

1. A declaration that Leon County Schools' Guide and associated policies and procedures violate Plaintiffs' fundamental rights as parents, under the United States and Florida constitutions, the Florida Parents' Bill of Rights and other statutes to the extent that they: (a) enable children to change gender identity at school by, *inter alia,* selecting a new "affirmed name and pronouns," without parental notification and consent; (b) prohibit teachers and other staff from communicating with parents about their children's gender dysphoria, including any desired change in name and pronouns, educational records, privacy facilities use, and overnight accommodations, without first obtaining the children's consent; and (c) instruct or

permit teachers and other staff to deceive parents by, *inter alia,* using different names and pronouns around parents than are used in school;

2. A declaration that teachers and staff: (a) may not facilitate a child's social transition to a different gender identity at school without parental notification and consent; (b) may communicate with parents if they have reason to believe their child may be dealing with gender confusion or dysphoria without first obtaining the child's consent; and (c) may not attempt to deceive parents by, among other things, using different names and pronouns around parents than are used in school;

3. A declaration that the Guide and attendant Student Support Plans prepared in accordance with the Guide are to be publicly rescinded and parents notified that said Guide and associated Student Support Plans affecting their children have been rescinded.

4. Preliminary and permanent injunctions prohibiting Defendants, their employees, agents and third parties acting at their direction from: (a) Using, referencing, relying on, or otherwise acknowledging the Guide and associated Student Support Plan as a resource for LCS staff, administrators, parents or students; (b) Distributing the Guide and associated Student Support Plan to LCS staff directly or indirectly through third parties; (c) Training staff to exclude parents from discussions, meetings, and other interventions with the parents' children related to the children's assertion of a discordant gender identity; (d) Failing to notify parents

when their children express the belief that they have a discordant gender identity and want to take actions to affirm that identify; (e) Failing to notify parents that LCS staff previously engaged with their children regarding a claim of a discordant gender identity without notifying the parents.

5.      Preliminary and permanent injunctions prohibiting Defendants, their employees, agents and third parties acting at their direction from instructing, directing, or encouraging LCS staff to participate in programs, initiatives, activities, or discussions in which LCS staff promise children that their parents will not be told about children's disclosures related to a belief that they have a discordant gender identity.

6.      For nominal damages;

7.      For compensatory damages according to proof for the injuries caused by Defendants' acts and omission, including  a) emotional distress, b) exacerbation of A.G.'s psychological and educational challenges requiring increased counseling and other interventions, c) ongoing emotional and psychological damage to their family dynamic, requiring therapeutic interventions to rebuild trust between parents and child which was damaged by the actions of Defendants, d) increased costs for providing alternatives for A.G. in order for her to receive an appropriate education untainted by ideological distractions which exacerbate her developmental challenges and diminish her academic potential, and other injuries as proven at trial;

61

8.    For attorneys' fees and costs under 42 U.S.C. § 1988;

9.    For such other relief as the Court deems proper.


Dated October 18, 2021.



/s/Mary E. McAlister
Mary E. McAlister (FL Bar No. 0010168)
CHILD & PARENTAL RIGHTS CAMPAIGN, INC.
P.O. Box 637
Monroe, VA 24574
770.448.4525
mmcalister@childparentrights.org

Vernadette R. Broyles (GA Bar No. 593026)*
CHILD & PARENTAL RIGHTS CAMPAIGN, INC.
5805 State Bridge Rd., Suite G310
Johns Creek, GA 30097
770.448.4525
vbroyles@childparentrights.org

Ernest G. Trakas (MO Bar 33813)*
Evans & Dixon, LLC
211 N. Broadway
St. Louis, MO 63102
 (314) 552-4188
etrakas@evans-dixon.com
* pro hac vice admissions pending

Attorneys for Plaintiffs

Verification

I, January Littlejohn, am over the age of 18 and the Plaintiff in this action, and I declare under penalty of perjury, pursuant to 28 U.S.C Section § 1746, that I have read the foregoing Verified Complaint, and the factual allegations thereof, and that to the best of my knowledge the facts alleged therein are true and correct.

Executed this 18th day of October, 2021 at Tallahassee, Florida

January Littlejohn

Verification

I, Jeffrey Littlejohn, am over the age of 18 and the Plaintiff in this action, and I declare under penalty of perjury, pursuant to 28 U.S.C Section § 1746, that I have read the foregoing Verified Complaint, and the factual allegations thereof, and that to the best of my knowledge the facts alleged therein are true and correct.

Executed this 18th day of October, 2021 at Tallahassee, Florida

Jeffrey Littlejohn