## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA
## (TALLAHASSEE DIVISION)

| | | |
|---|---|---|
| January Littlejohn, | ) | |
| Jeffrey Littlejohn, | ) | |
| Plaintiffs | ) | Case No. 4:21-CV-00415-MW/MJF |
| | ) | |
| v. | ) | |
| | ) | |
| School Board of Leon County, | ) | |
| Florida, Rocky Hanna, individually, | ) | |
| and in his official capacity as | ) | |
| Superintendent of Leon County | ) | |
| Schools, Dr. Kathleen Rodgers, | ) | |
| individually, and in her official | ) | |
| capacity as Assistant Superintendent, | ) | |
| Equity Officer and Title IX | ) | |
| Compliance Coordinator for Leon | ) | |
| County Schools, Rachel | ) | |
| Thomas, individually and in her | ) | |
| Official capacity as counselor at | ) | |
| Deerlake Middle School, Robin | ) | |
| Oliveri, individually and in her official | ) | |
| capacity as Assistant Principal of | ) | |
| Deerlake Middle School, | ) | |
| Defendants. | ) | |

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS FIRST AMENDED COMPLAINT

Plaintiffs, January and Jeffrey Littlejohn, by and through their attorneys of record, submit this Memorandum of Law in Opposition to Defendants' Motion to Dismiss Plaintiffs' First Amended Complaint:

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................... iii

FACTUAL BACKGROUND ..................................................................... 1

SUMMARY OF ARGUMENT ................................................................... 6

LEGAL ARGUMENT ............................................................................. 8

   I.  Plaintiffs' Claims Are Not Moot. ................................................. 8

     A.   *Plaintiffs' Damages Claim Prohibits A Finding of Mootness.* ............... 9

     B.   *Plaintiffs' Claims Arising From Completed Acts Cannot Be Moot.* ...... 11

   II.   Claims Against Individual Defendants In Their Official Capacities Are Not Duplicative of Claims Against the School Board. ............................ 15

   III.  Plaintiffs Sufficiently Allege Substantive Due Process Violations. ....... 18

     A.   *Plaintiffs Sufficiently Allege Infringement of Their Fundamental Right to Make Medical and Mental Health Decisions for Their Child.* ......... 20

     B.   *Plaintiffs Have Stated A Claim for Interference with their Fundamental Parental Rights Despite Defendants' Concealment of Facts Regarding Interactions with Their Daughter.* ............................ 24

        1.  *Plaintiffs have alleged that Defendants prohibited the receipt of information related to their daughter's gender identity that interferes with Plaintiffs' exercise of their fundamental parental rights.* ......................................................................... 25

        2.  *Defendants cannot capitalize on their concealment of information to conclude that there are insufficient facts to show coercion, which is not a necessary element in a parental rights claim.* ......................... 26

        3.  *Plaintiffs allege conscience-shocking behavior on the part of Defendants.* ........................................................................ 29

   IV.   Defendants Are Not Entitled To Qualified Immunity ...................... 34

     A.   *Defendants Cannot Meet Their Burden of Showing They Were Engaged in Discretionary Functions.* ........................................... 34

     B.   *Plaintiffs' Allegations Show Defendants Violated Clearly Established Constitutional Rights* ........................................................... 38

   V.  Plaintiffs Allege Viable State Constitutional Claims. ....................... 41

i

**A.** *Plaintiffs State A Viable Claim for Violation of the Right of Privacy Under Article 1, §23 of the Florida Constitution* ..................................42

**B.** *Plaintiffs State A Viable Claim for Violation of the Right to Substantive Due Process Under Article 1, §9 of the Florida Constitution* ..............44

**CONCLUSION** ..................................................................................................45

**WORD COUNT CERTIFICATION** ...............................................................46

**CERTIFICATE OF SERVICE** .......................................................................47

# TABLE OF AUTHORITIES

## Cases

*Adler v. Duval County School Bd*., 112 F.3d 1475 (11th Cir. 1997) ........................12

*Al Najjar v. Ashcroft*, 273 F. 3d 1330 (11th Cir. 2001) ...........................................15

*Already, LLC v. Nike, Inc.,* 568 U.S. 85 (2013) .........................................................15

*Arnold v. Bd. of Educ. of Escambia County*, 880 F.2d 305 (11th Cir.1989) .... 27, 39

*Beagle v. Beagle,* 678 So.2d 1271 (1996) ................................................................43

*Blau v. Fort Thomas Public School District*, 401 F.3d 381 (6th Cir. 2005) ...........22

*Brown v. Hot, Sexy and Safer Productions, Inc.*, 68 F.3d 525 (1st Cir. 1995) ........20

*Busby v. City of Orlando* 931 F.2d 764 (11th Cir. 1991) ........................................16

*Coral Springs St. Sys., Inc. v. City of Sunrise*, 371 F.3d 1320 (1lth Cir. 2004) ......14

*County of Sacramento v. Lewis*, 523 U.S. 833 (1998) ...................................... 24, 30

*Courson v. McMillian*, 939 F.2d 1479 (11th Cir. 1991) ................................... 36, 41

*Epperson v. Arkansas*, 393 U.S. 97 (1968) .............................................................20

*Flanigan's Enters., Inc. of Ga. v. City of Sandy Springs*,

   868 F.3d 1248 (11th Cir. 2017) ...........................................................................10

*Florida Ass'n of Rehab. Facilities, Inc. v. Florida Dep't of Health and Rehab.
Servs.*, 225 F.3d 1208 (11th Cir. 2000) ................................................................14

*Freedom from Religion Foundation, Inc. v. Orange County Sch. Bd.*,

   30 F.Supp.3d 1358 (M.D. Fla. 2014) ..................................................................13

*Hafer v. Melo*, 502 U.S. 21 (1991) ........................................................................41

*Harlow v. Fitzgerald*, 457 U.S. 800 (1982) ............................................................34

*Hatcher v. Desoto County. Sch. Dist. Bd. of Educ.*

   939 F. Supp. 2d 1232 (M.D. Fla. 2013) .............................................................17

*Hillcrest Prop., LLP v. Pasco County*, 915 F.3d 1292 (11th Cir. 2019) ................24

*Hoefling v. City of Miami*, 811 F.3d 1271 (11th Cir. 2016) .............................. 24, 30

*Hollis v. School Bd. of Leon County*, 384 So. 2d 661 (Fla. Dist. Ct. App. 1980) ...16

*Holloman v. Harland*, 370 F.3d 1252, 1263-64 (11th Cir. 2004) ................... 34, 35

*J.B. v. Fla. Dep't of Child. & Fam. Servs*., 768 So. 2d 1060 (Fla. 2000)......... 40, 44

*Johnson v. Dade County* 1992 WL 466902 (S.D. Fla. 1992)................................27

*Keating v. City of Miami,* 598 F.3d 753 (11th Cir. 2010),.......................................40

*Keister v. Bell,* 29 F.4th 1239 (11th Cir. 2022) .........................................7, 13

*Kentner v. City of Sanibel*, 750 F.3d 1274 (11th Cir. 2014)....................................24

*Kentucky v. Graham*, 473 U.S. 159 (1985)...............................................................16

*Lee v. Ferraro*, 284 F.3d 1188 (11th Cir. 2002)......................................................34

*Leebaert v. Harrington*, 332 F.3d 134 (2d Cir. 2003) .............................................20

*Loftus v. Clark–Moore*, 690 F.3d 1200 (11th Cir. 2012).........................................41

*Maddox v. Stephens,* 727 F. 3d 1109 (11th Cir. 2013) ...................................... 24, 30

*McGowan v. Maryland*, 366 U.S. 420 (1961) .........................................................26

*Methelus v. Sch. Bd. of Collier Cty., Fla.*,

   243 F. Supp. 3d 1266 (M.D. Fla. 2017) ..............................................................16

*Meyer v. Nebraska*, 262 U.S. 390 (1923) .................................................... 26, 38-40

*Morrison v. Jones*, 607 F.2d 1269 (9th Cir. 1979) .................................................24

*Parents for Privacy v. Barr*, 949 F.3d 1210 (9th Cir. 2020) ..................................20

*Parham v. J.R.,* 442 U.S. 584 (1979)......................................................... 22, 25, 39

*Pearson v. Callahan*, 555 U.S. 223 (2009)..............................................................40

*Pierce v. Soc'y of Sisters*, 268 U.S. 510 (1925) .............................................. 26, 38

*Preiser v. Newkirk*, 422 U.S. 395 (1975).................................................................15

*Rich v. Secretary, Florida Dept. of Corr*., 716 F.3d 525 (11th Cir. 2013)..............15

*Robertson v. Hecksel*, 420 F.3d 1254 (11th Cir. 2005) ...........................................24

*School Bd. of Orange Cty. v. Coffey*, 524 So. 2d 1052 (Fla. D.C.A. 1988) ..... 16, 17

*Seay Outdoor Advertising, Inc. v. City of Mary Esther, Fla.*,

    397 F.3d 943 (11th Cir. 2005) .............................................................14

*Sec'y of Labor v. Burger King Corp.*, 955 F.2d 681 (11th Cir. 1992) ...................15

*Stanley v. Broward County Sheriff*, 773 F. App'x 1065 (11th Cir. 2019) ...............12

*Thomas v. Evansville-Vanderburgh School Corp.*,

    258 Fed.Appx. 50 (7th Cir. 2007) ........................................................20

*Troiano v. Supervisor of Elections in Palm Beach Cty., Fla.*,

    382 F.3d 1276 (11th Cir. 2004) ............................................................14

*Troxel v. Granville*, 530 U.S. 57 (2000) ........................................................ 38, 44

*Uzuegbunam v. Preczewski*, 141 S. Ct. 792 (2021)....................................... 6, 9, 14

*Uzuegbunam v. Preczewski*, 992 F.3d 1346 (11th Cir. 2021) ..................................9

*Von Eiff v. Azicri*, 720 So.2d 510 (1998). .................................................. 40, 42, 43

*Waddell v. Hendry County Sheriff's Office*, 329 F.3d 1300 (11th Cir. 2003); ........24

*Wisconsin v. Yoder*, 406 U.S. 205 (1972) ...............................................................26

## FACTUAL BACKGROUND

Plaintiffs are seeking declaratory relief, nominal damages and compensatory damages for violation of their constitutional rights arising from Defendants' 2020-2021 secret meetings with and development of a covert "transgender support plan" for their 13-year-old special needs daughter without their knowledge or consent. (First Amended Complaint, "FAC," ¶¶ 2-3, 96-98). Defendants acted in accordance with a 2018 "LCS Lesbian, Gay, Bisexual, Transgender, Gender Nonconforming and Questioning Support Guide" (the "2018 Guide") developed by the Leon County Schools LGBTQ+ Equity Committee. (FAC ¶ 20).

The 2018 Guide directed Leon County Schools ("LCS") administrators and staff that the law required that they exclude parents from discussions and decisions about their children's gender identity unless the child consented. (FAC ¶¶ 33-42, 47-59). The 2018 Guide specifically said that parents were not to be notified if their child expressed a discordant identity at school because such notification could be dangerous to the child's health and well-being. (FAC ¶ 47). The 2018 Guide authorized **the minor student** to decide whether his or her parents would be notified about the child's belief that he is not a boy or she is not a girl or if the child is distressed about his or her biological sex. (FAC ¶ 51). The 2018 Guide included a model "transgender student support plan" to be developed during a meeting with the child and school staff, but not the parents unless the child agreed to their

involvement. (FAC ¶¶ 52-53). The support plan included questions on the child's preferred name and pronouns, which communal sex-separated restroom, locker room or shower they will use and with which sex-separated group the child will room on overnight trips. (FAC ¶ 54).  If the child indicated that his or her parents were not "supportive," then they were not notified of or invited to be present at the meeting and the minor child would make the consequential decisions without notification to, input from, or consent of their parents. (FAC ¶ 55). Staff were also authorized by the 2018 Guide to actively and intentionally deceive a child's parents by not using the child's assumed name or preferred pronouns when talking to child's parents, while using the preferred name and pronouns at other times. (FAC ¶ 144). As part of the training for implementation of the 2018 Guide, LCS staff were instructed that students who express a discordant gender identity are "protected by law" from having their parents notified or in attendance at gender support plan meetings without the child's consent. (FAC ¶¶ 57-58).

Plaintiffs' daughter, A.G., was a student at LCS' Deerlake Middle School during the 2018-2019, 2019-2020 and 2020-2021 academic years. (FAC ¶18). A.G. was diagnosed with ADHD and had a 504 Accommodation Plan in place during that time. (FAC ¶18). Mrs. Littlejohn, who is a licensed mental health professional, participated in all of the meetings related to A.G.'s 504 Plan. (FAC ¶19). A.G.'s

ADHD diagnosis affected her emotional development, so while she was physically 13, emotionally she was age 10 or 11. (FAC ¶118).

In the spring/summer of 2020, A.G., like several of her friends, began expressing confusion about her gender. (FAC ¶¶ 86, 87). Plaintiffs retained a private counselor to help A.G. deal with her gender confusion and Mrs. Littlejohn notified LCS counselor Shellie Rogers that they had made those arrangements. (FAC ¶ 90). As the school year approached, A.G. asked her parents to permit her to change her name to "J." and to use "they/them" pronouns. (FAC ¶ 91). Plaintiffs did not agree to make those changes. Plaintiffs said that A.G. could use J. as a "nickname" at school but would continue to be referred to as A.G. and a female. (FAC ¶ 92). Mrs. Littlejohn told A.G.'s homeroom teacher that A.G. had expressed confusion about her gender during the spring semester, that the family was working on the issue including seeing a private counselor, that Plaintiffs did not consent to A.G.'s request to change her name and pronouns, but that A.G. could use J. as a "nickname" with classmates and teachers if she desired. (FAC ¶ 94).

Shortly after that communication, unbeknownst to Plaintiffs. A.G. approached Mrs. Thomas and requested to use a different name and pronouns. (FAC ¶ 95). Mrs. Thomas, who was aware of A.G.'s ADHD diagnosis and 504 Plan, did not notify Plaintiffs of A.G.'s request. (FAC ¶¶ 96, 108). Instead, she and other Deerlake Middle School staff met privately with A.G. to develop a gender affirmation plan.

(FAC ¶ 110). As provided in the 2018 Guide, the development of the covert gender affirmation plan did not include Plaintiffs because A.G. did not ask that they be included. (FAC ¶ 112). Actually, A.G. was never asked by Thomas or any other LCS personnel whether she wanted her parents to attend. (FAC ¶ 111).

Plaintiffs knew nothing about the secret meeting(s) and covert gender support plan until A.G. made an offhand comment that she had had a meeting with several school staff members and thought it was funny that they asked her what restroom she preferred to use as a result of changing her name. (FAC ¶¶ 97-98). When Mrs. Littlejohn asked Mrs. Thomas about the meeting, Mrs. Thomas and Ms. Oliveri told Mrs. Littlejohn that they could not tell her anything. (FAC ¶ 102). Mrs. Thomas told Mrs. Littlejohn that she was not invited to the meeting because A.G., "by law" had to be the one to request her parents' attendance. (FAC ¶ 103). Mrs. Thomas advised Mrs. Littlejohn that 13-year-old A.G. was now "protected" under a non-discrimination law that does not provide for parental notification or input. (FAC ¶ 104).

Plaintiffs asked Defendant Rodgers and other LCS administrators for the legal authority for their actions for more than two months with no response. (FAC ¶¶ 118-125, 137-139). Finally, Dr. Rodgers said that there was no Florida law that obligates LCS staff to inform parents and that they want to create a "safe space" for students and honor their "right to privacy" while encouraging parental involvement. (FAC ¶¶

140-141). Dr. Rodgers did not explain how they were encouraging parental involvement with their failure to inform parents of issues at school related to their child's gender identity. (FAC ¶ 142). The only document Plaintiffs received in response to their request for "legal authority" was the 2018 Guide, which had been in use for more than two years but never disclosed to Plaintiffs. (FAC ¶¶ 147-150).

It was also two months before Plaintiffs saw the contents of the covert gender affirmation plan that Mrs. Thomas had filled out for A.G. and that LCS staff was implementing without their knowledge or consent. (FAC ¶¶ 114, 132). Plaintiffs learned that their 13-year-old special needs daughter was permitted to decide which privacy facility she would use and with which sex she would room on school trips and could change those decisions whenever she wanted. (FAC ¶¶ 145-146). The plan, for which Plaintiffs had not been consulted, indicated that Plaintiffs were aware, but "not supportive" of A.G.'s "gender transition." Because of that purported lack of support, LCS staff needed to "engage in privacy" (*i.e.* conceal the truth) when speaking with the parents. (FAC ¶¶ 134-135). LCS staff were directed to conceal from Mr. and Mrs. Littlejohn that their 13-year-old daughter was claiming a discordant gender identity and allowed to socially transition at school (FAC ¶ 135). Plaintiffs allege that by cutting the Littlejohns out of the decision-making process for A.G., Defendants profoundly harmed A.G. whom Defendants knew to have

learning difficulties and emotional delays and whom they knew had a therapist chosen by her parents and a mental health professional as a parent. (FAC ¶ 161).

Plaintiffs allege that the 2020-2021 actions of Defendants in accordance with the 2018 Guide violated their rights to direct their daughter's upbringing, make mental health decisions for their daughter and maintain family privacy and integrity.[1] They seek declaratory relief and nominal and compensatory damages for the violations of their rights.

## SUMMARY OF ARGUMENT

Defendants ignore binding Supreme Court and Eleventh Circuit authority and the wholly retrospective nature of Plaintiffs' claims for relief in their effort to escape liability for violating Plaintiffs' constitutional rights and causing their family harm in 2020-2021. Defendants claim that the School Board's enactment of a new LGBTQ guide that became effective on June 28, 2022, somehow moots claims based on actions taken two years ago. Besides being illogical, Defendants' mootness claim is specious and legally unsupportable. This is particularly true in light of, *inter alia,* the Supreme Court's 2021 decision finding that a nominal damages claim precludes a finding of mootness, *Uzuegbunam v. Preczewski*, 141 S. Ct. 792, 796 (2021), and Eleventh Circuit 2022 decision finding that stopping an offending policy going

---

[1] Because implementation of the 2018 Guidance with A.G. modified her 504 plan without parental consent, it is likely that Defendants also violated Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794.

forward does not redress an injury that occurred in the past. *Keister v. Bell,* 29 F.4th 1239, 1251 (11th Cir. 2022).

Defendants cannot escape official capacity liability in light of Mr. Hanna's status as an elected official and the possibility of the School Board denying liability for the other Defendants' actions taken contrary to law. Defendants also cannot hide behind qualified immunity. They do not provide objective evidence that would compel the conclusion that their actions were undertaken pursuant to the performance of their duties and within the scope of their *legal* authority. They also cannot assert that they did not know that intentionally misrepresenting the law and disregarding the rights of parents of a special needs child on matters that directly affect her mental health and safety violate clearly established rights.

Defendants fundamentally and intentionally misrepresent the nature of the rights they violated in an effort to defeat substantive due process violations under the federal and state constitutions. Defendants claim that, *inter alia,* intentionally misstating the law, directing staff to conceal information from parents and addressing and treating mental health issues with children without parental consent are part of the everyday administration of an educational program, such as selecting curriculum, that is part of their pedagogical obligations. Defendants further wrongly assert that coercion is a necessary element for a parental rights violation and that Plaintiffs, from whom Defendants have concealed information, do not allege

information showing coercion.  Finally, Defendants ignore their misrepresentation of the law and public statements that notifying parents is dangerous for children and parents are an obstacle to supporting children[2] when they claim there are no allegations that shock the conscience.

Plaintiffs have alleged sufficient facts to state claims for violation of their fundamental parental rights arising from Defendants' actions in 2020 and 2021. The claims are not moot and Defendants are not entitled to qualified immunity. Defendants' motion should be denied. Alternatively, Plaintiffs must be granted leave to amend.

## LEGAL ARGUMENT

### I.    Plaintiffs' Claims Are Not Moot.

Defendant School Board's approval of a new LGBTQ guidance document just days before Defendants filed their Motion to Dismiss does not absolve Defendants of the consequences of their violations of Plaintiffs' rights in 2020 and 2021. As is clearly apparent from the First Amended Complaint, Plaintiffs are not seeking prospective relief from their "gripes" about the 2018 Guidance. Instead, Plaintiffs are seeking a declaration that their constitutional rights were violated by Defendants' actions in 2020 and 2021 and an award of damages for the injuries caused by those

---

[2]    If this were true, then Defendants, as mandatory reporters, had a legal obligation, pursuant to FL. Stat. § 39.201 to report parental abuse to the Florida Department of Children and Families.

actions. Defendants acted in accordance with the 2018 Guidance when they violated Plaintiffs' constitutional rights, but it is Defendants' course of conduct, not the contents of the 2018 Guide, that is focus of Plaintiffs' action.

The constitutional violations that were caused by Defendants' adherence to the 2018 Guide occurred in 2020 and 2021, long before the new Guide was approved. The effects of the violations are continuing, but the causes are *faits accomplis* which are not erased by enactment of a new Guide or any other subsequent conduct. Defendants cannot reinvent Plaintiffs' claims in order to escape liability through a claim of mootness. Defendants' mootness argument is all the more specious in light of binding precedent.

### A. Plaintiffs' Damages Claim Prohibits A Finding of Mootness.

Binding Supreme Court and Eleventh Circuit precedent conclusively vitiate Defendants' assertion that Plaintiffs' claim for nominal damages is mooted by Defendants' enactment of new LGBTQ guidance. (MTD, p. 17). *Uzuegbunam v. Preczewski*, 141 S. Ct. 792, 796 (2021); *Uzuegbunam v. Preczewski*, 992 F.3d 1346, 1347 (11th Cir. 2021). In *Uzuegbunam,* the Supreme Court held that a claim for nominal damages was sufficient to preserve the viability of a case that might otherwise be moot. Where, as here, Plaintiffs are alleging a completed violation of a legal right, a request for nominal damages provides the necessary redress to maintain Article III standing. 141 S.Ct. at 802. As was true of the Plaintiff in *Uzuegbunam,*

Plaintiffs "experienced a completed violation of [their] constitutional rights" when Defendants implemented the protocols of the 2018 Guide to conceal from them information and actions taken by them related to their daughter's mental health. *See id.* Plaintiffs request not only nominal damages, which would be sufficient in and of themselves to preclude a finding of mootness, but also compensatory damages. (FAC Prayer for Relief, ¶¶ 2, 3, 5, 6, 8, 9, 11, 12, 15, 16).

On remand, the Eleventh Circuit reversed its prior ruling that the plaintiff's claim for nominal damages did not preclude mootness. *Uzuegbunam,* 992 F.3d at 1347. Notably, the Eleventh Circuit's prior ruling was based on *Flanigan's Enters., Inc. of Ga. v. City of Sandy Springs*, 868 F.3d 1248, 1263-71 (11th Cir. 2017) (*en banc*), cited by Defendants (MTD, p. 17). The Court noted that, prior to *Uzuegbunam, Flanigan's* was binding precedent for the proposition that nominal damages cannot preclude a finding of mootness. *Id.* The Supreme Court's ruling in *Uzuegbunam* abrogated that holding, requiring that the Eleventh Circuit reverse. *Id.* Nevertheless, Defendants cite to *Flanigan's* for the proposition that "Nominal damages, like declaratory relief, are a remedy that may be granted by the federal courts upon a proper exercise of our jurisdiction; **they are not themselves an independent basis for that jurisdiction,**" the very holding abrogated by *Uzuegbunam.* (MTD p. 17) (emphasis added). Defendants disingenuously claim that *Flanigan's* was abrogated "on other grounds" while quoting the very statement

specifically overruled by the Supreme Court and Eleventh Circuit. That sleight of hand pettifoggery does not change the reality that a claim for nominal damages, even standing alone, precludes a finding of mootness.

Since Plaintiffs are seeking compensatory damages and nominal damages to redress the injuries received as a result of the completed violations of their constitutional rights by Defendants in 2020-2021, their case is not moot.

### B. Plaintiffs' Claims Arising From Completed Acts Cannot Be Moot.

Defendants attempt to escape liability by fundamentally misrepresenting the nature of Plaintiffs' claims and then asserting that the claims as misrepresented are moot. (MTD, pp. 13-19). Defendants boldly and wrongly proclaim that their adoption of a new LGBTQ guide that governs LCS staff conduct beginning on June 28, 2022 somehow moots Plaintiffs' claim for declaratory relief and damages arising from staff conduct occurring in 2020 and 2021 by implementing the 2018 Guide. (MTD p. 16). Defendants state that: "Plaintiffs allege the actions of School Board staff were taken pursuant to a version of the Guide that is no longer in effect." (MTD, p. 6). That is true and points to the retrospective nature of Plaintiffs' claims, which no longer include claims for prospective injunctive relief. Inexplicably, Defendants then claim that enacting the new guide has somehow erased the prior conduct of LCS staff and the damage it caused. While convenient for Defendants' desire to avoid liability, the argument is logically incoherent and legally unsupportable. In fact, the

cases cited by Defendants, when viewed in the context of the actual claims raised by Plaintiffs, establish that Plaintiffs' claims are not moot.

Defendants admit that Plaintiffs have a claim for a past harm that is no longer occurring. (MTD p. 16). However, they then engage in some linguistic legerdemain and logical leapfrog to claim that because staff is no longer acting under the 2018 Guide Plaintiffs' claims are moot because they "no longer need protection from **future injury."** (MTD, p. 16, citing *Adler v. Duval County School Bd*., 112 F.3d 1475, 1477 (11th Cir. 1997)). In *Adler,* the Eleventh Circuit found that the plaintiffs' claims for prospective injunctive and declaratory relief were moot because they had graduated and therefore no longer needed protection from the district's graduation prayer policy. 112 F. 3d at 1477. However, their claim for money damages for the harms caused by the policy prior to their graduation remained justiciable. *Id.* Similarly, in *Stanley v. Broward County Sheriff*, 773 F. App'x 1065, 1069 (11th Cir. 2019), the Eleventh Circuit found that the plaintiff's request for prospective relief was no longer justiciable due to changed circumstances, but his claim for money damages for the past conduct remained viable. In this case, Plaintiffs are not seeking prospective equitable relief which would be affected by enactment of the new guide, so there is no question of mootness as there was in *Adler* and *Stanley*. As was true in *Adler* and *Stanley,* Plaintiffs' claims for relief for the past conduct of Defendants remain viable.

*Freedom from Religion Foundation, Inc. v. Orange County Sch. Bd.*, 30 F.Supp.3d 1358, 1364 (M.D. Fla. 2014) ("*FFRF*"), cited by Defendants as support for their mootness argument, also points to the continuing viability of Plaintiffs' claims. In *FFRF*, the plaintiffs sought nominal damages and a declaratory judgment stating the defendants had violated their constitutional rights in a prior refusal to permit literature distribution. *Id.* They also sought a prospective declaratory judgment and permanent injunction against future refusals. *Id.* After the school district changed its policy to permit distribution of plaintiffs' literature, defendants successfully sought dismissal of the prospective relief claims as moot, but "explicitly recognized that Plaintiffs' claims regarding past allegedly unconstitutional conduct will remain." *Id.* The same is true in this case. There are no prospective relief claims to declare as moot. The claims regarding past allegedly unconstitutional conduct remain viable–regardless of whether Defendants choose to recognize that fact.

In *Keister v. Bell,* 29 F.4th 1239, 1250 (11th Cir. 2022), the court did say, as Defendants allege, that "the doctrine of voluntary cessation does not apply when there is "no reasonable expectation that the voluntarily ceased activity will, in fact, actually recur after the termination of the suit." (MTD, p. 18). However, the Eleventh Circuit went on to say that "the government cannot always moot a case by simply changing the challenged policy or law." *Id.* "Ceasing an offending policy going forward does not redress an injury that occurred in the past." *Id.* at 1251; *see also,*

*Florida Ass'n of Rehab. Facilities, Inc. v. Florida Dep't of Health and Rehab. Servs.*, 225 F.3d 1208, 1216-17 (11th Cir. 2000) (Plaintiffs' request for relief regarding services rendered prior to Congress' change in funding mechanisms had not become moot by the time the district court entered judgment). In *Keister*, as in this case, the plaintiff sought damages and other relief for the Defendants' past violations of his constitutional rights. *Id.* Citing *Uzuegbunam,* the Eleventh Circuit specifically held that the defendants' adoption of a new policy did not render the case moot. The same is true for this case.

Contrary to Defendants' assertions, the mere enactment of a new policy, ordinance, or statute does not *ipso facto* render a case moot. Instead, a case focused on the contents of a governmental enactment is not mooted by a new enactment unless "interim relief or events have completely and irrevocably eradicated the effects of the alleged violation." *Seay Outdoor Advertising, Inc. v. City of Mary Esther, Fla.*, 397 F.3d 943, 947 (11th Cir. 2005) (New sign ordinance eradicated the specific provision challenged by plaintiff); *Troiano v. Supervisor of Elections in Palm Beach Cty., Fla.*, 382 F.3d 1276, 1283 (11th Cir. 2004) (Election supervisor's installation and use of audio voting equipment in election and continued use eradicated the effects of the old policy's limitation on placement of the machines); *Coral Springs St. Sys., Inc. v. City of Sunrise*, 371 F.3d 1320, 1328 (1lth Cir. 2004) (repeal of challenged ordinance before lawsuit was filed eradicated its effects on

plaintiff which failed to seek approval under new ordinance). In this case, as discussed *supra*, the enactment of a new LGBTQ guidance document directing LCS staff conduct as of June 28, 2022 did nothing to eradicate the effect of and damage caused by the violations of Plaintiffs' constitutional rights which occurred in 2020-2021.

Defendants' enactment of the new LGBTQ guide did not erase the effect of their prior conduct. Consequently, a live controversy persists between Plaintiffs and Defendants for which this Court can grant meaningful relief, which precludes finding that the case is moot. *See Al Najjar v. Ashcroft*, 273 F. 3d 1330, 1336 (11th Cir. 2001) (a case is moot when it no longer presents a live controversy with respect to which the court can give meaningful relief).[3] The binding precedent in *Uzuegbunam* further requires rejection of Defendants' mootness argument.

## II. Claims Against Individual Defendants In Their Official Capacities Are Not Duplicative of Claims Against the School Board.

Defendants claim that Mr. Hanna, Dr. Rodgers, Ms. Thomas and Ms. Oliveri must be dismissed as defendants in their official capacities because a "§1983 suit

---

[3]     The other cases cited by Defendants do not require a different result. In *Sec'y of Labor v. Burger King Corp*., 955 F.2d 681, 684 (11th Cir. 1992) and *Rich v. Secretary, Florida Dept. of Corr*., 716 F.3d 525, 532 (11th Cir. 2013) the court found that the defendants' last minute enactments of new policies did not eradicate the effects of the prior policies. In *Already, LLC v. Nike, Inc.,* 568 U.S. 85, 91 (2013) and *Preiser v. Newkirk*, 422 U.S. 395, 401 (1975) the plaintiffs had not sought damages but only prospective relief that was mooted by Defendants' actions.

against an official of the government in his official capacity is deemed to be a suit against the entity that employs the official." *Busby v. City of Orlando* 931 F.2d 764, 776 (11th Cir. 1991) (citing *Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985)). In fact, precedent is not nearly so conclusive as Defendants claim it is.

Defendants' argument that Mr. Hanna should be dismissed pursuant to *Busby* and *Graham* is fatally flawed because Mr. Hanna is not an employee of the School Board. Pursuant Article IX, § 5 of the Florida Constitution, Mr. Hanna has been elected Superintendent of Leon County Schools by the citizens of Leon County. (FAC, ¶11). Florida appellate courts have definitively established that elected school superintendents are not mere agents or employees of the school board improperly joined as defendants. *School Bd. of Orange County v. Coffey*, 524 So. 2d 1052, 1054 (Fla. Dist. Ct. App. 1988). Consequently, Mr. Hanna "was properly sued as an agency separate from the school board." *Id.*

> The district school superintendent, like members of the school board, is a constitutional officer. Article IX, § 5, Florida Const. (1968). While the superintendent may be appointed by the school board in a district in which the people by resolution approve the appointive system, Section 230.24, the Leon County School Superintendent has at all times been elected by the people of Leon County.

*Hollis v. School Bd. of Leon County*, 384 So. 2d 661, 664 (Fla. Dist. Ct. App. 1980).

Defendants' citation to *Methelus v. Sch. Bd. of Collier Cty., Fla.*, 243 F. Supp. 3d 1266, 1282 (M.D. Fla. 2017) for the proposition that the official capacity claim against Mr. Hanna is duplicative is specious and unavailing. As alleged in the First

Amended Complaint and noted in *Hollis*, the superintendent of Leon County Schools is elected by the people of Leon County. (FAC ¶11). By contrast, the superintendent of Collier County Schools, the relevant district in *Methelus*, is appointed by the School Board.[4] Therefore, in *Methelus*, the superintendent was an employee of the school board, and an official capacity suit could be regarded as duplicative. In this case, however, Mr. Hanna is an elected official, "not a mere agent or employee of the school board improperly joined as a defendant." *Coffey*, 524 So. 2d at 1054. His official capacity claim is not duplicative.

Even as to Dr. Rodgers, Ms. Thomas and Ms. Oliveri, who are employed by the School Board, *Busby* and *Graham* do not require dismissal, particularly at this stage in the litigation. *Hatcher v. Desoto County Sch. Dist. Bd. of Educ.* 939 F. Supp. 2d 1232, 1236 (M.D. Fla. 2013). "It is true that an official capacity claim may be redundant when the entity is also a named defendant." *Id.* (citing *Busby*). "The School Board, however, is contesting any liability based on Fusco's conduct, and therefore it remains plausible at this stage of the proceedings that a separate official capacity claim can be maintained against Fusco." *Id.*

Similarly, here, discovery may reveal questions regarding whether the individual defendants were acting within their authority, *see discussion infra,* and it

---

[4] *See, https://www.collierschools.com/Domain/101*

is likely the School Board will contest liability for their actions. That is particularly true in light of the allegations that the individual Defendants misrepresented federal and state laws as providing a right of privacy of children against their parents and right to conceal information from parents. (FAC ¶¶ 35-46, 51-59). Defendants also authorized and directed LCS staff to violate state medical consent laws by excluding parents from support plan meetings in which mental health decisions were made for their minor children. (FAC ¶¶ 78-81). Until the factual record is developed, it remains plausible that a separate official capacity claim can be maintained against the individual Defendants. Therefore, precedent does not require dismissing them in their official capacities.

## III. Plaintiffs Sufficiently Allege Substantive Due Process Violations.

Defendants' assertion that Plaintiffs' Section 1983 claims must be dismissed because "no action of the School Board, School Board personnel, or any of the Defendants in this action burdened or infringed on any rights that Plaintiffs enjoy under the Due Process Clause" (MTD, p. 37), is breathtaking in its misrepresentation of the allegations of the Complaint, misstatement of the "crux" of Plaintiffs' claims, and sophomoric misinterpretation of constitutional principles. It is also irresponsibly specious and disingenuous. Defendants, *inter alia,* deliberately and actively concealed facts directly affecting A.G.'s mental health and well-being from Plaintiffs (FAC, ¶¶ 33-37, 49-55, 100-113, 126-127, 134-136), refused to provide

authority for their wrong assertion that the law prohibits disclosure of children's gender identity issues to their parents (FAC, ¶¶ 120-125, 137-143, 147-150), and publicly affirmed and defended their protocol of excluding parents from decision making related to what Defendants willingly admit are mental health issues. (FAC ¶¶ 43-45, 67, 74-77, 155-157).

Now Defendants are claiming that Plaintiffs' claims should be dismissed because they are not required to help Plaintiffs exercise their right to direct the upbringing and medical/mental health care of their children or to foster the parent/child relationship. (MTD, p. 36). This new argument is more specious, disingenuous and outrageous than the others. Plaintiffs, one of whom is a mental health professional, explicitly notified Defendants that they were exercising their rights to make mental health care decisions for A.G. and that they did not consent to further involvement of Defendants in A.G.'s gender identity issues. (FAC ¶¶ 19, 92-94, 100). Defendants actively, intentionally, and deliberately disregarded Plaintiffs' overt assertion of their rights as part of a protocol that Defendants publicly admitted was designed to circumvent those very parental rights. (FAC ¶¶ 43-45, 67, 69-77, 92-97, 102-104, 106-107). Defendants regularly stated that they were acting to "protect" students like A.G. from those they deemed to be "unsupportive parents" like Plaintiffs, thereby admitting that they were actively interfering with the parent-

child relationship.  (FAC ¶¶ 69-76, 107, 141-143, 155-157). To now claim that there was no interference strains credulity.

### A. Plaintiffs Sufficiently Allege Infringement of Their Fundamental Right to Make Medical and Mental Health Decisions for Their Child.

Defendants assert that "there is no Constitutional liberty interest" requiring that parents be notified and involved in decisions related to their child's gender identity "because the case involves school administration," and "public education of children is unquestionably entrusted to the control, management, and discretion of school boards." (MTD, p. 25, citing *Epperson v. Arkansas*, 393 U.S. 97, 104 (1968)). More specifically, Defendants assert that Plaintiffs' claims are deficient because "courts have rejected attempts by parents to establish a fundamental right to dictate curriculum and program choices at public schools where they send their children" (MTD, p. 30, citing *Thomas v. Evansville-Vanderburgh School Corp.*, 258 Fed.Appx. 50, 53-54 (7th Cir. 2007); *Leebaert v. Harrington*, 332 F.3d 134, 140-42 (2d Cir. 2003); *Brown v. Hot, Sexy and Safer Productions, Inc.*, 68 F.3d 525, 533-34 (1st Cir. 1995)). Defendants further state that "both the Sixth and Ninth Circuits have held that nothing in the Constitution prohibits public schools from **making curriculum choices or to even direct the school administration more generally**." (MTD pp. 30-31, citing *Parents for Privacy v. Barr*, 949 F.3d 1210, 1230–33 (9th Cir. 2020)) (emphasis added). Implicit in Defendants' argument is that discussions

20

between school officials and children regarding gender identity and socially transitioning a child at school to a new gender identity are merely discussions about curriculum and general school administration solely within the purview of Defendants' authority as educators. The allegations of the Complaint and Defendants' own public statements illustrate the fallacy in that conclusion.

Defendants' 2018 guidance, which is the guidance that is relevant to Plaintiffs' claims, acknowledges that decisions and discussions regarding a child's gender identity are related to **the health and well-being** of the child. (FAC, ¶47) (emphasis added).

> Outing a student, especially to parents, **can be very dangerous to the students [sic] health and well-being**. Some students are not able to be out at home because their parents are unaccepting of LGBTQ+ people out. As many as 40% of homeless youth are LGBTQ+, many of whom have been rejected by their families for being LGBTQ+. Outing students to their parents can literally make them homeless.

(*Id.*, citing Exhibit A, p. 15).

School Board member Bowen publicly stated that "Affirmed names and pronouns are **a central part of a student's identity**." (FAC, ¶ 74). Something that is "a central part of a student's identity" is not merely a curriculum choice or matter of school administration delegated to the public schools. Mrs. Bowen also stated that "unmet medical needs" including puberty blockers (medications that arrest pubertal development in children) were a challenge for LGBTQ+ students that "hopefully we [the school board] can have remedies in place for." (FAC, ¶76). "Unmet medical

21

needs" are not a curriculum choice or matter of school administration within the purview of public schools without parental involvement and consent. Defendant Rodgers publicly stated that "students need to be able to show their 'identities' to their teachers and for their peers to embrace those identities," again signaling that gender identity issues including names and pronouns are matters affecting the child's well-being (*i.e.* mental health), not a curriculum choice. (FAC, ¶ 156).

By Defendants' own, repeated, admissions gender identity issues are issues critical to the safety and well-being of the child. They are not part of, *e.g.,* the school curriculum, hours of the school day, school discipline, extracurricular activities or a dress code, *i.e.,* the issues of public education generally "committed to the control of state and local authorities." *Blau v. Fort Thomas Public School District*, 401 F.3d 381, 395-96 (6th Cir. 2005). Affirming a child's discordant gender identity involves significant mental health and medical decisions affecting the well-being of children. (FAC, ¶¶ 78-79) As issues critical to the health and well-being of their child, gender identity issues are exclusively within the sole purview of the parents. *Parham**Error! Bookmark not defined.** v. J.R.,* 442 U.S. 584, 604 (1979). *Parham* affirmed that parents (not public schools) "retain a substantial, if not the dominant, role in medical and mental health care decisions for their children, absent a finding of neglect or abuse." *Id.* Unless the parent has been determined to be unfit, and if there are no allegations of neglect or abuse, then courts should apply the longstanding

presumption that parents act in the best interests of their children. *Id.* Notably, the *Parham* Court affirmed that parental decision-making predominates even when the parents' choice is disagreeable to the child (such as not using a "preferred" name or pronoun). *Id.* at 603.

Plaintiffs have alleged, *inter alia*, that Defendants engaged in private meetings with their daughter in which they discussed A.G.'s gender identity, including her preferred name and pronouns, bathroom and overnight accommodation preferences and in social transitioning with A.G. over a course of time without parents' knowledge or approval. Defendants' 2018 guidance and public statements affirm that these are not matters related to curriculum or school administration but are issues that are central to children's identity, mental health, and well-being. As such, they are not part of the pedagogical interests over which Defendants have authority. Instead, they are part of the child's physical and mental health over which Plaintiffs, as fit parents, have plenary authority.

Allegations of Defendants' usurpation of that authority more than sufficiently state a substantive due process claim for violation of Plaintiffs' parental rights to direct the medical and mental health decision-making of their children. Therefore, contrary to Defendants' argument, there is a "Constitutional liberty interest requiring that parents be notified and involved in decisions related to their child's gender

identity, including names and pronouns," which are mental health concerns as Defendants have publicly acknowledged. Defendants violated that interest.

### B. Plaintiffs Have Stated A Claim for Interference with their Fundamental Parental Rights Despite Defendants' Concealment of Facts Regarding Interactions with Their Daughter.

Defendants' remaining arguments regarding substantive due process and parental rights are a hodgepodge of disconnected statements citing cases regarding standards of review,[5] property rights,[6] alleged law enforcement misconduct,[7] and child protective services actions which separated children from parents.[8] (MTD pp. 23-25). Piecing together the statements, Defendants seem to be arguing that Plaintiffs' Section 1983 claims must be dismissed because Plaintiffs have failed to allege that Defendants prohibited Plaintiffs from receiving information, failed to allege coercion, and/or failed to allege conscience shocking behavior. None of those assertions has merit. Furthermore, any alleged insufficiency in allegations of misconduct by Defendants is attributable to Defendants' active concealment of

---

[5]   *Hillcrest Prop., LLP v. Pasco County*, 915 F.3d 12927 (11th Cir. 2019); *Kentner v. City of Sanibel*, 750 F.3d 1274 (11th Cir. 2014).

[6]   *Id.*

[7]   *County of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998); *Waddell v. Hendry County Sheriff's Office*, 329 F.3d 1300, 1305 (11th Cir. 2003); *Robertson v. Hecksel*, 420 F.3d 1254, 1258 (11th Cir. 2005); *Hoefling v. City of Miami*, 811 F.3d 1271, 1282 (11th Cir. 2016).

[8]   *Morrison v. Jones*, 607 F.2d 1269 (9th Cir. 1979); *Maddox v. Stephens,* 727 F. 3d 1109, 1119 (11th Cir. 2013).

information from Plaintiffs, which is a central issue in the case. Defendants cannot now seek to profit from their misconduct.

### 1. Plaintiffs have alleged that Defendants prohibited the receipt of information related to their daughter's gender identity that interferes with Plaintiffs' exercise of their fundamental parental rights.

Defendants clearly stated in writing and in public statements that information regarding children's gender identity was to be concealed from parents. The 2018 Guidance unequivocally stated that parents were not to be notified if their child "has exhibited behavior in school leading administrators or teachers to believe the student is LGBTQ+." (FAC, ¶ 47). LCS staff were trained and instructed to follow that guidance and to not disclose to parents information regarding their child's gender identity without the child's permission. (FAC ¶¶ 29-31). Mrs. Littlejohn was told directly by LCS staff that she could not receive. *i.e.*, was prohibited from obtaining, information regarding her daughter's interactions with staff related to her gender identity because "A.G. was now 'protected' under a non-discrimination law that does not include parental notification or input." (FAC, ¶ 104). Defendants purposely emphasized the need for protecting children's "privacy" against their own parents. (FAC, ¶¶ 107, 141-143).

These allegations evidence actions by Defendants to prohibit the disclosure of information regarding children's gender identity to parents. This manifestly interferes with the parents' right to direct the upbringing and make mental health

decisions for their children under *Parham,* 442 U.S. at 604. Therefore, even if, as Defendants claim, "interference of parental rights is only actionable where the state is requiring or prohibiting some activity," (MTD, p. 27), Plaintiffs have alleged such a prohibition. Nebraska violated parental rights by prohibiting teaching the German language, *Meyer v. Nebraska*, 262 U.S. 390 (1923); Oregon violated parental rights by prohibiting private schools, *Pierce v. Soc'y of Sisters*, 268 U.S. 510 (1925) and Wisconsin violated parental rights by prohibiting parents from disenrolling their children from school before age 16, *Wisconsin v. Yoder*, 406 U.S. 205 (1972). So too, here, the allegations of the Complaint show that Defendants violated Plaintiffs' rights by prohibiting disclosure of gender identity information to parents.

> **2. *Defendants cannot capitalize on their concealment of information to conclude that there are insufficient facts to show coercion, which is not a necessary element in a parental rights claim.***

Defendants' claim that Plaintiffs must prove "coercion" to establish a violation of their fundamental parental rights is not supported by precedent. Coercion is a factor for Establishment Clause claims based on the genesis of the right, *i.e.,* prohibition of state-mandated religions which existed at the founding of the country. *McGowan v. Maryland*, 366 U.S. 420, 563 (1961). However, there is no similar genesis and no need to address coercion for the parental right, which arises from the nature of the family as an institution long recognized at common law as "essential to the orderly pursuit of happiness by free men." *Meyer,* 262 U.S. at 399.

The Southern District of Florida stated that "government coercion, specifically in the form of inducing children to refrain from communicating with their parents on a given subject, is not a necessary element of a cause of action for infringement with parental rights." *Johnson v. Dade County* 1992 WL 466902 at *5 (S.D. Fla. 1992). Defendants take issue with the *Johnson* court's analysis, but cannot argue about the veracity of *Pierce* and *Yoder* which are the basis of the analysis. As the *Johnson* court said, *Pierce, Yoder* and their progeny do not require coercion, a necessary element in Establishment Clause cases, to state a cause of action for infringement of fundamental parental rights. *Id.* at *5-*6. Defendants do not, because they cannot, cite to a single case that contradicts that conclusion.

The Eleventh Circuit's use of the term "coercive" to describe the actions of the counselors in *Arnold v. Bd. of Educ. of Escambia County*, 880 F.2d 305 (11th Cir.1989) does not translate into a requirement of coercion to provide a parental rights violation by school staff. While the actions of the counselors in *Arnold* were coercive (convincing the students to obtain an abortion and helping fund it), the court did not determine that plaintiffs had to allege coercion, but that in alleging it they more than satisfied the notice pleading standards for a civil rights claim. *Id* at 312. In other words, coercion may give rise to a fundamental parental rights violation, but Defendants cite no authority that it is a required element to establish a parental rights violation.

Notably, *Arnold* involved similar interference with parental notification as is alleged here. *Id.* at 312-13. In *Arnold*, school staff convinced the students not to tell their parents about the pregnancy and abortion. *Id.* That directive "unduly interferes with parental authority in the household and with the parental responsibility to direct the rearing of their child." *Id.* at 313. "This deprives the parents of the opportunity to counter influences on the child the parents find inimical to their religious beliefs or the values they wish instilled in their children." *Id.* That is precisely the kind of interference and deprivation of rights to direct the upbringing of their child that Plaintiffs allege here.

Even if coercion were an element to be considered (which it is not), the question of whether A.G. was "coerced" into excluding her parents must be answered in the context of A.G.'s particular circumstances, not by Defendants' generalized concept of what would be regarded as "coercive."[9] A.G. had been diagnosed with ADHD and had a 504 Plan that was overseen by Defendant Thomas. (FAC ¶¶ 18-19) While A.G.'s biological age was 13, developmentally she had the maturity of a 10- or 11-year-old. (FAC ¶ 118), something that would be known to

---

[9] Furthermore, any determination of whether what transpired between Defendants and A.G. could be classified as coercive requires knowing what occurred in the meeting(s). That is not known as this point because of Defendants' active concealment of the information under the guise of a "legal right of privacy" on the part of A.G. to not have the information disclosed to her parents unless she consents. Defendants cannot now claim that the information was readily available to Plaintiffs. (MTD at 32 n.7).

her counselor, Ms. Thomas. Knowing about her vulnerabilities, Ms. Thomas told A.G. she would schedule a transgender support plan meeting. (FAC ¶ 109). She did not ask A.G. whether she wanted her parents to be present at the meeting. (FAC ¶ 111).. (FAC ¶ 109). This was a young girl with a recognized disability and an emotional age of 10 or 11 whom an adult authority figure, a school counselor, informed would have a meeting to discuss her gender identity issues. (FAC ¶ 109). Her parents were not mentioned. (FAC ¶ 111). During the meeting, Ms. Thomas developed and completed the transgender support plan form for A.G. (FAC ¶ 114). A middle-school child, with the developmental maturity of a 10- or 11-year-old in a meeting with counselors and other school staff who develop a support plan and tell her she can make her own decisions might not feel that she can ask for her parents to be there. A.G.'s immaturity was evidenced by her believing it was funny to be asked what restroom she wanted to use. (FAC ¶ 98). Analyzed in context, it cannot be assumed, as Defendants do, that A.G. did not feel coerced into excluding her parents and concealing information from them. Whether those authority figures actively encouraged or coerced A.G. to refrain from communicating with her parents cannot be known without obtaining the information deliberately concealed from Plaintiffs.

### 3. *Plaintiffs allege conscience-shocking behavior on the part of Defendants.*

Defendants employ their misleading characterization of the nature of their conduct as "school administration" akin to curriculum choices and classroom discipline to assert that Plaintiffs have not alleged conduct that "shocks the conscience." (MTD, p. 25). As discussed more fully *supra,* Section IIIA, Defendants have acknowledged that the gender identity protocol that is the subject of this case involves the health and well-being of children, issues that are central to their identity, and unmet medical needs, none of which is a pedagogical concern. (FAC, ¶¶ 47, 74, 156, Exhibit A). The written statements in the 2018 Guidance and the public statements by Ms. Bowen and Dr. Rodgers are themselves conscience-shocking as statements from an elected official and trained educator. Looking at the actions taken by all Defendants in accord with those statements reveal conduct that is egregious, arbitrary and without even rational basis, let alone a compelling state interest. *See Maddox*, 727 F.3d at 1119; *Hoefling*, 811 F.3d at 1282. Defendants invite the Court to conduct an "exact analysis" of the circumstances. (MTD, pp. 24-25, citing *County of Sacramento*, 523 U.S. at 850). Such an analysis of the actual circumstances as opposed to Defendants' characterization of their conduct as "educational administration" will lead to the inescapable conclusion that Plaintiffs have alleged conduct that shocks the conscience.

Defendants stated in writing in their 2018 Guidance that:

> Under the Family Educational Rights and Privacy Act (FERPA), students, current or former, have a right to seek to amend their school records if said records are "inaccurate, misleading, or in violation of the student's rights of privacy." (34 C.F.R. § 99.7(a)(2)(ii))

(FAC, ¶ 34). This statement is misleading. In fact, the regulation provides: **parents or eligible students** have the right to "[s]eek amendment of the student's education records that the **parent or eligible student** [age 18 or high school graduate] believes to be inaccurate, misleading, or otherwise in violation of the student's privacy right." (FAC, ¶ 37). As trained educational professionals, Defendants knew or should have known that FERPA and its implementing regulations grant parents sole authority over their children's educational records until the child is 18 or has finished secondary school. Nevertheless, Defendants intentionally misrepresented, in writing, that FERPA grants the right to students. (FAC, ¶ 38). Since FERPA is a long-standing federal law that is integral to school administration, there is no rational basis for Defendants to have misrepresented it in the 2018 Guidance, except to create a legal fiction that children have separate and unique privacy rights vis-a-vis their parents that they used to conceal information from Plaintiffs. (FAC, ¶ 39).

Defendants' 2018 Guidance also presumed that children needed to be protected from their parents: "Q: A student has exhibited behavior in school leading administrators or teachers to believe the student is LGBTQ+. Should the parents or legal guardians be notified? A: **No**. Outing a student, especially to parents, can be very dangerous to the students [sic] health and well-being." (FAC, ¶ 47). For elected

officials and educators employed by taxpayers and parents to educate children to say that disclosing information about children to their own parents is "very dangerous" shocks the conscience (and contravenes state abuse/neglect mandatory reporter requirements). There cannot be any rational basis for those employed to serve the parents of Leon County to cast them as dangerous to their children.

Defendants Thomas' and Oliveri's conduct toward Plaintiffs also shocks the conscience in the context of A.G.'s particular circumstances. Thomas and Oliveri knew that A.G. was a vulnerable emotionally immature, disabled child with an ADHD diagnosis and 504 plan. (FAC ¶ 108). That knowledge notwithstanding, Defendants Thomas and Oliveri met with A.G. privately without notifying Plaintiffs who were intimately involved in A.G.'s education, did not inform A.G. that her parents could be present, and then completed a "transgender support plan" for A.G. that excluded her parents' participation. (FAC ¶¶ 106-111). On its face, this action amended and modified A.G.'s 504 accommodation plan, thereby violating the Rehabilitation Act of 1973. When confronted by Mrs. Littlejohn, Defendants Thomas and Oliveri claimed that A.G., an emotionally immature 13-year-old, was protected "by law" from having the information regarding the meeting disclosed to her parents. (FAC ¶¶ 102-104). For educational professionals to tell the mother of a disabled child with a 504 plan that her emotionally immature daughter has more

rights than does her mother to oversee her health and well-being clearly shocks the conscience.

Board member Bowen publicly affirming that the School Board viewed parents as a problem for LGBTQ children also shocks the conscience. Ms. Bowen described the "stress of living in a non-affirming household," and "parent/community pushback on LGBTQ+ inclusion" as challenges LGBTQ+ students were facing that the LCS Board had to address. (FAC ¶ 75). An elected official publicly stating that the parents she was elected to serve were "obstacles" to their children's well-being can be classified as shocking. Similarly, it shocks the conscience for Dr. Rodgers to proclaim that she is not obligated to inform parents of issues related to their child's mental health and well-being and that she needs to create a "safe space" for children, apparently presuming parents to be unsafe, and then only involve parents if they will "adequately" support the child's wishes (FAC ¶¶ 141-142).

Plaintiffs have alleged that Defendants developed and implemented protocols prohibiting staff from disclosing information important to their child's well-being, and in particular from discussing the specifics of conversations with government officials with parents. Plaintiffs have alleged that Defendants informed staff that children like A.G. were "protected by law" from having this information revealed to their parents. Plaintiffs have alleged that their special needs daughter participated in

at least one private meeting with adult authority figures at school who had been instructed not to disclose to parents what occurred. Plaintiffs have sufficiently alleged that Defendants participated in socially transitioning their daughter to a different gender, a decision that significantly implicates a child's mental health and well-being, at school without their knowledge or consent. Plaintiffs have sufficiently alleged facts showing Defendants deliberately set out to conceal information from them about their daughter's mental health to state a claim that their parental rights have been violated.

## IV. Defendants Are Not Entitled To Qualified Immunity.

At this early stage in the litigation Defendants cannot establish they are entitled to qualified immunity. Because determining the questions of discretionary functions and clearly established constitutional rights require factual development, qualified immunity is usually addressed at the summary judgment phase. *Holloman v. Harland*, 370 F.3d 1252, 1263-64 (11th Cir. 2004). Government officials may seek to have the complaint dismissed on qualified immunity grounds prior to discovery only if the threshold questions are answerable based solely on the allegations in the pleadings. *Id.* at 1263 n.6. That is not the case here.

### A. Defendants Cannot Meet Their Burden of Showing They Were Engaged in Discretionary Functions.

To even be potentially eligible for qualified immunity, Defendants must prove that they were engaged in a "discretionary function" when they performed the acts

34

of which the Plaintiffs complain. *Id.* at 1263-64, citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). If the defendant was not acting within his discretionary authority, he is ineligible for the benefit of qualified immunity. *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002). "While a number of our cases omit this step of the analysis, binding Supreme Court and Eleventh Circuit precedents require us to consider expressly this critical threshold matter." *Holloman*, 370 F.3d at 1264.

In the qualified immunity context, courts in the Eleventh Circuit do not focus on whether the acts in question involved the exercise of actual discretion, but whether the acts are of a type that fell within the employee's job responsibilities. *Id.* It is a two-fold inquiry: "whether the government employee was (a) performing a legitimate job-related function (that is, pursuing a job-related goal), (b) through means that were within his power to utilize." *Id.* at 1266. The Defendants' acts cannot be characterized and assessed at too high a level of generality. *Id.* Nearly every act performed by a government employee can be described, in general terms, as ostensibly "furthering the public interest," which make it impossible to determine whether the employee was truly acting within the proper scope of his job-related activities. *Id.* Consequently, courts consider a government official's actions at the minimum level of generality necessary to remove the constitutional taint. *Id.* "After determining that an official is engaged in a legitimate job-related function, it is then necessary to turn to the second part of the inquiry and determine whether he is

executing that job-related function — that is, pursuing his job-related goals — in an authorized manner." *Id.* at 1266-67.

To meet their initial burden of proof, Defendants must show "objective circumstances which would compel the conclusion that [their] actions were undertaken pursuant to the performance of [their] duties and within the scope of [their] authority." *Courson v. McMillian*, 939 F.2d 1479, 1487 (11th Cir. 1991). Defendants do not make the necessary showing here. Defendants claim that they have met their burden because the actions alleged by Plaintiffs "focus on actions core to their duties as public officials, managing the affairs of schools within the District, interpreting and applying school practice and policies, and interacting with parents concerning the education of a student in District schools." (MTD, p. 23). That misleading conclusory statement does not provide the objective proof required under *Courson* and disregards the Eleventh Circuit's admonition that a defendant's duties cannot be characterized at too high a level of generality. *Holloman,* 370 F.3d at 1266.

Most telling in the Defendants' conclusory statement regarding their job-related functions is the assertion that they were "interacting with parents concerning the education of a student in District schools." The allegations in the Complaint describe, and indeed the crux of Plaintiffs' claims are, that Defendants purposely refused to interact with them regarding their daughter. Also, the allegations in the

Complaint describe interactions with Plaintiffs' daughter that were **not** concerning the education of their daughter, but rather her mental health. Furthermore, Plaintiffs allege that Defendants did far more than merely "interpreting and applying school practice and policies." Defendant Rodgers oversaw creation and adoption of a transgender student guidance document that directed school staff that: 1) parents were not to be notified regarding their child's gender identity (Exhibit A, p. 15), 2) non-discrimination laws required that children be permitted to choose which sex-separated privacy facilities and overnight accommodations they would use without parent input (Exhibit A, p.14), and 3) calling a child by their legal name instead of a preferred alternative constitutes actionable harassment. (Exhibit A, p. 14). Defendants offer no objective evidence that Defendants were acting within the scope of their authority or competency when they misrepresented state and federal law in the 2018 Guide and misstated the law when they told Plaintiffs that their 13-year-old special needs daughter had a legal right to privacy that prevented disclosure of important information to her parents (FAC ¶¶ 37-39; 47; 102-104).

Defendants offer no objective circumstances which would compel the conclusion that Defendants' actions were undertaken pursuant to the performance of their duties and within the scope of their constitutional authority. Since the allegations of the Complaint describe interactions with Plaintiffs' daughter directly

affecting mental health decision-making it cannot reasonably be asserted that their actions were "core to their duties" or competencies.

Finally, since discovery has only partially begun, the full nature and extent of the Defendants' acts and omissions are not known. This makes it impossible for Defendants to establish that they were acting pursuant to the performance of their duties based upon the allegations of the Complaint. No Defendant can meet the burden of demonstrating that he or she was engaged in a "discretionary function" when he or she performed the acts of which the Plaintiffs complain. Therefore, Defendants are not eligible to claim qualified immunity. *Lee v. Ferraro*, 284 F.3d at 1194.

### B. Plaintiffs' Allegations Show Defendants Violated Clearly Established Constitutional Rights

Even if Defendants were able to meet their burden, they still would not be entitled to qualified immunity. Looking at the allegations of the Complaint rather than Defendants' specious reinterpretation of constitutional precedent leads to the conclusion that Defendants flouted long-established constitutional principles. Defendants acknowledge that "[t]he Due Process Clause of the Fourteenth Amendment 'protects the fundamental right of parents to make decisions concerning the care, custody, and control of their children.' *Troxel v. Granville*, 530 U.S. 57, 65-66 (2000); *see also Pierce v. Soc'y of Sisters*, 268 U.S. 510 (1925)." (MTD, p. 12), and that parents' fundamental right to parent their children is protected through

the Florida Constitution." (MTD p. 32). Defendants also acknowledge that state interference with those rights is actionable when the state is requiring or prohibiting some activity. (MTD p. 16, citing *Meyer,* 262 U.S. 390). In this case, as discussed *supra*, Defendants prohibited disclosure of children's gender identity information to parents. This is the same type of prohibition the Eleventh Circuit found violative of parental rights in *Arnold,* 880 F.2d at 312-14. The Eleventh Circuit established that a directive to students to not disclose information to their parents "unduly interferes with parental authority in the household and with the parental responsibility to direct the rearing of their child," and that schools must refrain from such directives. *Id.* at 313-14. As well as referencing *Meyer, Pierce,* and *Troxell*, the Eleventh Circuit relied on *Parham'*s holding that "[t]he law's concept of the family presumes that parents possess what a child lacks in maturity, experience and capacity for judgment," as authority for its finding that withholding information important to their child's upbringing, care, control, and mental health from parents unduly interferes with their fundamental rights. *Id*. at 314 (citing *Parham,* 442 U.S. at 602).

At the time that Defendants created the written transgender student guidance, trained staff regarding the guidance and interacted with Plaintiffs' daughter in 2020, it had been clearly established in the Eleventh Circuit for more than 30 years that school officials violate parents' fundamental rights to direct their children's upbringing when they direct that parents not be informed about medical and mental

health issues regarding their children. That clearly established right was in turn based on constitutional rights that had been clearly established by the Supreme Court for nearly 100 years in the case of *Meyer* and *Pierce* and more than 40 years in the case of *Parham.* As was true of the police officers in *Keating v. City of Miami,* 598 F.3d 753, 767 (11th Cir. 2010), it should have been obvious to Defendants that their conduct would violate Plaintiffs' constitutional rights.

It should also have been obvious to Defendants that their conduct would violate Plaintiffs' rights under the Florida Constitution. Article 1, §9 of the Florida Constitution protects the long-established fundamental right of parents to direct the upbringing of their children from unwarranted encroachment by the government. *J.B. v. Fla. Dep't of Child. & Fam. Servs*., 768 So. 2d 1060, 1063 (Fla. 2000). That 20-year-old Florida Supreme Court precedent was clearly established when Defendants implemented the 2018 Guidance with Plaintiffs' daughter. Likewise, it was clearly established in 2020 that parents have a fundamental right to parent their children that is not merely "protected" but is recognized as a fundamental right under the explicit right of privacy enacted by the people of Florida in Article 1, §23 of the Florida Constitution. *Von Eiff v. Azicri*, 720 So.2d 510, 514 (1998).

Plaintiffs' allegations establish constitutional violations under the federal and state constitution. This satisfies one part of the two-part test for determining whether a state official is entitled to qualified immunity. *Keating,* 598 F.3d at 762(citing

*Pearson v. Callahan*, 555 U.S. 223, 236 (2009)). In addition, the long-standing Eleventh Circuit precedent in *Arnold* building on *Meyer, Pierce,* and *Parham* provides a materially similar case that has been decided so as to be clear to reasonable state officials that prohibiting school staff from disclosing to parents information related to their child's mental health, *i.e.,* gender identity, was unlawful. *Loftus v. Clark–Moore*, 690 F.3d 1200, 1204-05 (11th Cir. 2012). That would satisfy the other prong of the two-prong test. *Id.*

At this pleading stage of the case, Defendants cannot meet their threshold burden of providing "objective circumstances which would compel the conclusion that [their] actions were undertaken pursuant to the performance of [their] duties and within the scope of [their] authority." *Courson*, 939 F.2d at 1487. Therefore, they are not entitled to qualified immunity. Even if the threshold showing were made, the allegations of the Complaint, if proven, show that their actions violated Plaintiffs' clearly established fundamental parental rights so as to foreclose qualified immunity.

Defendants further claim that the FAC should be dismissed because injunctive relief is not available against individual Defendants. (MTD, p. 46 n.8). As is apparent from the FAC, Plaintiffs are not seeking injunctive relief, so the prohibition against such relief does not affect Plaintiffs' claims. Notably, the quote from *Hafer v. Melo*, 502 U.S. 21, 30, 27 (1991)) cited by Defendants, "Plaintiffs may sue individual-

capacity defendants only for money damages," actually comports with Plaintiffs' requested relief.

## V.   Plaintiffs Allege Viable State Constitutional Claims.

Defendants cannot deny that the Florida Constitution accords equal or superior rights of privacy and substantive due process than are provided under the United States Constitution. Nevertheless, Defendants claim that Plaintiffs' claims for relief should be dismissed based on another potpourri of arguments about private citizens, damages, and attorneys' fees, none of which defeat Plaintiffs' claims for equitable relief and damages against these state actor Defendants. In fact, Defendants' claims that Plaintiffs' state constitutional claims should be dismissed are nothing more than regurgitation of their flawed analysis of the federal constitutional claims. Since Plaintiffs have stated claims for federal constitutional violations, they have also stated viable claims for violations of the Florida Constitution.

### A.  *Plaintiffs State A Viable Claim for Violation of the Right of Privacy Under Article 1, §23 of the Florida Constitution*

Defendants "recognize that parents have a fundamental right to parent their children and that such right is protected through the Florida Constitution." *D.M.T. v. T.M.H.,* 129 So. 3d 320, 335 (Fla. 2013). The right is not merely "protected" under the Florida Constitution, but is recognized as a fundamental right under the explicit

right of privacy enacted by the people of Florida in Article 1, §23 of the Florida Constitution. *Von Eiff v. Azicri*, 720 So.2d 510, 514 (1998). The Florida Supreme Court has determined that this explicit right of privacy "is a fundamental right which we believe demands the compelling state interest standard." *In re T.W*, 551 So. 2d 1186, 1192 (Fla. 1989). Under that standard, state intrusion was justified in some cases dealing with public disclosure of private facts, such as bank records, but no government intrusion has survived review in cases dealing with personal decision-making. *Id.* Parental decisions regarding child rearing and education fall into the latter category so that "the State may not intrude upon the parents' fundamental right to raise their children except in cases where the child **is threatened with harm**." *Beagle v. Beagle,* 678 So.2d 1271, 1276 (1996) (emphasis added). "[I]t appears to be an unassailable proposition that otherwise fit parents ... who have neither abused, neglected, or abandoned their child, have a reasonable expectation that the state will not interfere" with their decision-making. *Von Eiff,* 720 So.2d at 515.

Plaintiffs here had the reasonable expectation that Defendants would neither interfere with nor undermine their decision regarding A.G.'s gender identity concerns, which they were addressing as a family and with a mental health professional. (FAC ¶¶ 90, 94, 161). There are no allegations that A.G. was threatened with harm by her parents' decision. In turn, there is no basis upon which Defendants could interfere with that decision. Defendants' written guidance and actions show a

clear and unequivocal intent to systemically interfere with parental decision-making regardless of a threat of harm, as seen in the guidance's provision unequivocally stating that parents were NOT to be told about a child's gender identity (Exhibit A, p. 15) and their instruction to staff that under the law they could not inform parents. (FAC ¶¶ 37-39; 47; 102-104). These allegations state a viable claim for violation of Plaintiffs' fundamental parental rights under the Florida Constitution.

### B. Plaintiffs State A Viable Claim for Violation of the Right to Substantive Due Process Under Article 1, §9 of the Florida Constitution.

Likewise, Plaintiffs state a viable substantive due process claim under Article 1, §9 of the Florida Constitution, which protects the "full panoply of individual rights" and in particular, the long-established fundamental right of parents to direct the upbringing of their children, from unwarranted encroachment by the government. *J.B. v. Fla. Dep't of Child. & Fam. Servs*., 768 So. 2d 1060, 1063 (Fla. 2000). As the Florida Supreme Court said in *J.B.,* "The significance of the rights at issue here cannot be overstated." *Id.* at 1064. "[I]t is plain beyond the need for multiple citation that a natural parent's desire for and right to the companionship, care, custody, and management of his or her children is an interest far more precious than any property right." *Id.* (citation omitted). That is reflected in the Florida Supreme Court's treatment of fundamental parental rights under Article 1, §23, and

in the United States Supreme Court's labeling of parental rights as "fundamental" in *Troxel*, 530 U.S. at 65-66.

As discussed more fully in Sections IIIA and IIIB, Plaintiffs have alleged facts that state claims for violation of their fundamental parental rights under the United States Constitution. Since Florida's due process clause incorporates the same "panoply of rights," Plaintiffs have also alleged sufficient facts to state a claim for violation of fundamental parental rights under the Florida Constitution.

## CONCLUSION

Plaintiffs' Complaint states causes of action for violation of Plaintiffs' fundamental parental rights under the United States and Florida constitutions. against all Defendants. Defendants are not subject to dismissal in their official capacities and are not entitled to qualified immunity in their individual capacities.

For these reasons, Defendants' motion to dismiss should be denied. Alternatively, if this Court determines that there are insufficiencies in the Complaint, Plaintiffs should be granted leave to amend.

Dated: July 29, 2022.

*/s/Mary E. McAlister*
Mary E. McAlister (FL Bar No. 0010168)
CHILD & PARENTAL RIGHTS CAMPAIGN, INC.
P.O. Box 637
Monroe, VA 24574
770.448.4525
mmcalister@childparentrights.org

Vernadette R. Broyles (GA Bar No. 593026)*
CHILD & PARENTAL RIGHTS CAMPAIGN, INC.
5805 State Bridge Rd., Suite G310
Johns Creek, GA 30097
770.448.4525
vbroyles@childparentrights.org

Ernest G. Trakas (MO Bar 33813)*
Evans & Dixon, LLC
211 N. Broadway
St. Louis, MO 63102
 (314) 552-4188
etrakas@evans-dixon.com

* admitted pro hac vice
Attorneys for Plaintiffs

## WORD COUNT CERTIFICATION

This document complies with word limits set forth in N.D. Fla. Local Rule 7.1(F), and contains 10,859 words, which includes headings, footnotes, and quotations, but does not include the case style, table of contents, table of authorities, signature block or Certificates of Word Count and Service.

/s/ *Mary E. McAlister*
MARY E. MCALISTER

## CERTIFICATE OF SERVICE

I certify that on this 29th day of July 2022, a true and correct copy of the foregoing was electronically filed in the U.S. District Court, Northern District of Florida, using the CM/ECF system which will send a notice of electronic filing to all counsel of record.

/s/ *Mary E. McAlister*
MARY E. MCALISTER